Charles **FICKINGER** on behalf of himself and others similarly situated

v.

**C.I. PLANNING CORPORATION and City Investing Company.**

Civ. A. No. 81–0951.

United States District Court, E.D. Pennsylvania.

June 4, 1986.

---

Eugene Spector, Gross & Sklar, P.C., Philadelphia, Pa., for plaintiff.

Jayne S. Robinson, Davis, Polk & Wardell, New York City, for defendant.

## MEMORANDUM and ORDER

SHAPIRO, District Judge.

### I. *Facts and Procedural History*

Plaintiff, on behalf of a class of selling shareholders, brought this action alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) (the "Act"), and Pennsylvania common law, to recover damages for misrepresentations depreciating the financial condition of C.I. Realty Investors, a real estate investment trust (the "Trust"), and keeping the market price of its shares artificially low. On May 19, 1986, a hearing in accordance with Fed.R.Civ.P. 23(e) was held on plaintiff's motion to approve the settlement and for attorneys' fees and expenses. Upon full consideration of the written submissions and oral argument in support of the settlement, the court approves the settlement as fair, reasonable and adequate to the class and grants counsel for the class' petition for fees and costs in part.

On March 11, 1981, plaintiff filed a complaint on behalf of himself and other shareholders of the Trust (other than the defendants and their affiliates), who acquired shares of the Trust prior to November 29, 1977 and sold those shares during the period from November 29, 1977 through August 30, 1979.

Plaintiff had purchased shares in April, 1972, and sold them in April, 1978. Defendant, C.I. Planning Corp., a subsidiary of defendant City Investing Company, was the advisor to the Trust during that time and until August 30, 1979. Plaintiff al-

leged that between November 29, 1977 and August 30, 1979, defendants, insiders and controlling persons with respect to the Trust, failed to reveal certain favorable real estate appraisals and estimates of increased rental income from prospective lease renewals to depress the market price of its shares and profit from the purchase of Trust shares.

Defendants moved for summary judgment on two grounds: (1) that the action was time-barred, and (2) that plaintiff failed to state a cause of action because disclosure of the appraisals and the estimates was adequate. In denying without prejudice defendants' claim that the action was time-barred, the court held that a two-year limitations period applied and that there was a factual issue as to whether plaintiff knew or should have known the allegedly actionable facts on or before March 11, 1979 (two years prior to suit). The court also denied defendants' claim that plaintiff failed to state a cause of action because of factual issues as to the adequacy of disclosure.

After discovery with regard to plaintiff's motion for class certification, briefing and argument, plaintiff's motion that the action be maintained as a class action, with Charles Fickinger as class representative, was granted on July 3, 1984; the court certified a class of "all C.I. Realty Investors (Trust) shareholders, other than defendants and their affiliates, who acquired Trust shares prior to November 29, 1977 and sold their shares during the period November 29, 1977 through April 4, 1978" (the "Class"). The court certified the class conditionally in order to determine the following four issues:

1) whether defendants failed to disclose adequately with regard to the Trust office buildings' negotiated increases in rentals and consequent appreciation in value in the November, 1977 Fiscal 1978 Second Quarter Report and/or the January 31, 1978 Fiscal 1978 Third Quarter Report;

2) whether defendants failed to disclose a real estate appraisal prepared March 15, 1978 and a rental projection prepared on or after March 31, 1978.

3) whether said failures to disclose caused the value of the shares to be depressed to the benefit of the defendants and the detriment of the plaintiff class; and

4) whether defendants' failure to disclose was fraudulently concealed until on or after March 11, 1979.

Plaintiff engaged in discovery and settlement negotiations with defendants throughout 1985 and early 1986. The court assisted at the request of the parties on some occasions. The parties reached an original settlement agreement on July 3, 1985. Under the settlement agreement originally proposed, defendants were to deposit $600,000 in cash in escrow with Provident National Bank within ten days of entry of approval of the settlement. This amount, and the interest thereon, would comprise the Settlement Fund. Plaintiff and the members of the class agreed to look solely to the Settlement Fund for satisfaction of all their claims against defendants, including but not limited to, claims for damages, interest and attorneys' fees. Class members filing Valid Proofs of Claim were entitled to receive from the Settlement Fund their provable loss (their actual out-of-pocket loss, *i.e.*, the difference between the price at which they purchased Trust shares held as of November 29, 1977 and the price at which they sold such shares during the class period) or $.50 per share, whichever was less. In the event the maximum allowable recovery of all qualified claimants exceeded the net Settlement Fund, qualified applicants were to receive a *pro rata* share. The settlement agreement also provided that before distribution of the Settlement Fund to qualified claimants, plaintiff's counsel were to receive from the Settlement Fund their costs and expenses incurred (not in excess of $50,000) and such attorneys' fees as the court would allow (not in excess of $200,-000). In the event the maximum allowable recovery was less than the Settlement

Fund, the balance was to be returned to defendants.

On July 3, 1985, the court directed that notice of the proposed settlement be sent to the class and published twice, in two successive weeks, in *The Wall Street Journal.* The court also ordered that all brokers or nominees holding shares of C.I. Realty Investors of record for members of the class who had not previously supplied counsel for the class with the names and addresses of such class members forward the notice to the beneficial owners of those shares or supply counsel for the class with a list of the names and addresses of such beneficial holders.

In accordance with the court's Order, counsel for the class sent notice to all class members that a hearing to determine whether the proposed settlement was fair, reasonable and adequate would be held on September 20, 1985. The notice stated that any member of the class could appear and be heard at the hearing to object to the settlement. The notice was also published in *The Wall Street Journal.* Proof of mailing and publication of the notice was filed with this court on August 9, 1985 and supplemented by a status report filed with the court on November 8, 1985.

The scheduled hearing was held before The Honorable Thomas N. O'Neill, Jr. on September 20, 1985. No objections were filed; no one appeared to testify. On November 8, 1985, counsel for the class filed a supplemental affidavit concerning class administration: were the court to approve the settlement agreement, the funds distributed to the class would have been no more than $10,192.50; claims representing in excess of 250,000 shares would have been rejected because they were not sold at an actual loss.

On December 4, 1984, upon review of the supplemental affidavit concerning claims' administration, the court ordered counsel for the class to submit to the court representative market prices of the shares of stock from April, 1972 through April, 1978. Upon examination of the fluctuation of the stock, the court ascertained that the reason for the nominal recovery of the class was that virtually no shares purchased between May, 1974 and November, 1977 were sold at a loss during the class period so that the actual loss requirement precluded a significant portion of the class from participating in the settlement fund. Consequently, the court concluded that it would not approve the settlement agreement and so informed the parties on January 29, 1986.

On April 4, 1986, the parties entered into a revised settlement agreement. Under the revised settlement agreement, defendants agreed to pay all shareholders who sold their shares during the class period in an amount equal to $.50 per share, regardless of whether the sale price was above or below the purchase price. In addition, counsel for the class agreed to reduce their requested attorneys' fees from $200,000 to $135,000. In all other respects, the settlement agreement remained the same.

On April 8, 1986, a hearing was held on the revised proposed settlement agreement. Because the revised agreement removed the actual loss limitation on recovery and enabled all members of the class to participate in the settlement fund, the court gave its preliminary approval to the revised settlement agreement (the "Settlement Agreement").

On April 10, 1986, the court directed that notice of the proposed settlement be sent to the class and published in the national edition of *The Wall Street Journal.* Accordingly, on April 16, 1986, all class members were mailed notice of a hearing on May 19, 1986 to determine whether the proposed settlement was fair, reasonable and adequate. The notice stated that any member of the class could appear then and be heard to object to the settlement. Notice was published in *The Wall Street Journal* on April 23, 1986.

The court also ordered that all brokers or nominees holding shares of C.I. Realty Investors of record for members of the class who had not previously supplied counsel for the class with the names and addresses of such class members forward the notice to the beneficial owners of those shares or

supply counsel for the class with a list of names and addresses of such beneficial holders.

Class members who previously filed proofs of claim and had their claims rejected on the basis that they had no provable losses were advised that they were eligible to participate in the settlement fund and that it was not necessary for them to refile proofs of claim. Proof of mailing and publication of the notice was submitted to the court on May 19, 1986 (filed of record on June 4, 1986) and supplemented by a status report filed with this court on June 2, 1986. Under the revised settlement agreement, claims approved for distribution to the class total $143,543.

## II. *Approval of Settlement*

■ Rule 23(e) of the Federal Rules of Civil Procedure requires court approval of a class action settlement:

> A class action shall not be dismissed or compromised without the approval of the Court, and notice of the proposed dismissal or compromise shall be given to all members of the class....

Approval of a proposed class action settlement is discretionary with the court. *Girsh v. Jepson,* 521 F.2d 153, 156 (3d Cir.1975); *Ace Heating & Plumbing Company v. Crane Company,* 453 F.2d 30, 34 (3d Cir.1971). Settlement is a course favored by law, *Weight Watchers of Philadelphia, Inc. v. Weight Watchers International, Inc.,* 455 F.2d 770, 773 (2d Cir.1972), but a settlement will be approved only if it is "fair, adequate, and reasonable" to the members of the class, *Walsh v. Great Atlantic and Pacific Tea Company, Inc.,* 726 F.2d 956, 965 (3d Cir.1983). The settlement must be both substantively reasonable compared to the likely rewards of litigation, *Shlensky v. Dorsey,* 574 F.2d 131, 147 (3d Cir.1978), and the result of good faith, arms length negotiations, *Weinberger v. Kendrick,* 698 F.2d 61, 74 (2d Cir.1982).

■ The appellate courts have specified factors to be considered prior to decision upon the fair, reasonable, and adequate nature of a proposed class action settlement. *See Malchman v. Davis,* 706 F.2d 426, 433–34 (2d Cir.1983) (nine factors); *Reed v. General Motors Corp.,* 703 F.2d 170, 172 (5th Cir.1983) (six factors); *Officers for Justice v. Civil Service Commission,* 688 F.2d 615, 625, *cert. denied,* 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983) (eight factors). In *Girsh v. Jepson,* 521 F.2d 153 (3d Cir.1975), the Court of Appeals for this Circuit noted the relevancy of the following nine factors in determining the fairness of a settlement:

> ... (1) the complexity, expense and likely duration of the litigation ...; (2) the reaction of the class to the settlement ...; (3) the stage of the proceedings and the amount of discovery completed ...; (4) the risks of establishing liability ...; (5) the risks of establishing damages ...; (6) the risks of maintaining the class action through the trial ...; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery ...; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation....

*Girsh,* 561 F.2d at 157 (quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974)).

### A. *Uncertainties of Litigation*

■ Plaintiff alleged that defendants failed adequately to disclose in either the Fiscal 1978 Second Quarter Report dated November 29, 1977, and/or the Fiscal 1978 Third Quarter Report dated January 31, 1978, certain improvements in the Trust's prospects because of higher rents to be received from new leases in two of its New York City office buildings. Plaintiff alleged that defendants understated the increase in rentals on the new leases in order to purchase Trust shares for their own accounts at depressed per share prices. Defendants contended that the disclosures regarding the prospective increases in rent and the office buildings' consequent appreciation in value were adequate.

Plaintiff also alleged that defendants failed to disclose real estate and rental projections that the two office buildings were worth more than reflected on the corporate books. Defendants argued that the real estate appraisals and rental projections need not have been disclosed because they were speculative estimates not material facts.

Subsequent to the institution of this action, the Court of Appeals in *Flynn v. Bass Brothers Enterprises, Inc.*, 744 F.2d 978 (3d Cir.1984), clarified the balancing test to determine if there is a duty to disclose soft information:

> Courts should ascertain the duty to disclose asset valuations and other soft information on a case by case basis, by weighing the potential aid such information will give a shareholder against the potential harm, such as undue reliance, if the information is released with a proper cautionary note.

*Id.* at 988 (footnote omitted). *Flynn* standards are not applied retroactively; pre-*Flynn* law governs this action. *See Flynn,* 744 F.2d at 988.

Pre-*Flynn,* the presentation of future earnings, appraisal asset valuations and other hypothetical data was discouraged. Disclosure of soft information was not prohibited but the SEC presumption against disclosure was followed in this Circuit. *See Kohn v. American Metal Climax, Inc.,* 458 F.2d 255 (3d Cir.1972). Plaintiff argued that there was a duty to disclose even before *Flynn* so that *Flynn* did not expand the duty to disclose. But even if the *Flynn* balancing test were to govern this action, settlement avoids the risk that the court would weigh heavier the factors favoring non-disclosure.

Plaintiff alleged that defendants' disclosures regarding negotiated increases in rentals and consequent appreciation in building values were inadequate in the November 29, 1977 Fiscal 1978 Second Quarter Report and/or the January 31, 1978 Fiscal 1978 Third Quarter Report. However, the quarterly reports at issue did contain statements regarding new leases in the Trust's New York City office buildings and the overall prospects of the Trust. *See,* for example, the Fiscal 1978 Second Quarter Report:

> During the past several months, the general real estate market has experienced substantial improvement. Demand for office space in mid-Manhattan, in particular has been very good with the result that much of the office space that was available earlier in the fiscal year at the Trust's two major office buildings has been leased on favorable terms. As discussed below, income from these new leases will commence in the period between September 1, 1977 and January, 1978. Consequently, we anticipate a significant improvement in the Trust's operating results in the next fiscal year beginning March 1, 1978....
>
> At August 31, 1977, the aggregate amount of space on which rent was not being collected at 485 Lexington Avenue and 750 Third Avenue approximated 25 percent of the buildings' rentable space compared to almost 100 percent occupancy at the same date last year. The new office leases that take effect between September 1, 1977 and January 1, 1978, however, have reduced the buildings' unleased space to approximately eight percent. The estimated aggregate annual base rent (excluding electric and potential escalations) represented by the new leases approximates $2.0 million. In addition, two leases are pending which, if signed, would generate aggregate annual base rent (excluding electric and potential escalations) of another $350,000 after January 1, 1978.

Settlement avoided the risk that the court would have found the disclosures adequate.

But even if plaintiff had convinced the court that defendants had a legal duty to disclose and failed to do so adequately, plaintiff would have had to convince a jury of the materiality of the undisclosed facts.

An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... Put another

way, there must be a substantial likelihood that the disclosure of an omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Healey v. Catalyst Recovery of Pennsylvania, Inc.,* 616 F.2d 641, 647 (3d Cir.1980).

Plaintiff would have had to prove that a reasonable investor would have been interested in appraisals, the amounts stated in those appraisals and/or the rental income projected for the major properties controlled by the Trust. Defendants maintained that the information was not material because a reasonable investor would not have cared about it. Defendants also argued that even if the information were material, it was in fact made public on February 9, 1978 when the chairman of the Trust and President of City Investing, Peter Huang, was interviewed by Dow Jones, a major Wall Street publisher, and discussed improvement in the Trust's prospects in relation to new leases:

> The Trust has signed new leases on its two major office building whose occupancy rate in fiscal 1979 will increase to 95% or better from 75% in the second quarter in fiscal year 1978. Rental rates on new leases having increased to about $11.00 per square foot from $8.00 per square foot a year ago.

Settlement avoided the risk that the jury would have agreed with the defendants that making this information public in this way precluded liability in any event.

Plaintiff would have to prove some sort of reliance to establish this Rule 10b–5 claim. *Sharp v. Coopers and Lybrand,* 649 F.2d 175, 186–7 (1981), *cert. denied,* 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982). Plaintiff contended that reliance is presumed in a "fraud on the market" case. But defendants contended that a fraud on the market presumption was inapplicable here and that plaintiff had to prove actual reliance. Plaintiff also would

have had to establish the scienter required to sustain a cause of action under Rule 10b–5. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Settlement avoided the risk that plaintiff would not have been able to meet these burdens of proof.

Plaintiff also would have to establish that defendants continued fraudulently to conceal material information until March 11, 1979 (two years prior to filing their complaint) to toll the statute of limitations. *Van Buskirk v. Cary Canadian Mines Ltd,* 760 F.2d 481, 487 (3d Cir.1985). Plaintiff had to demonstrate that he and the members of the class with the exercise of reasonable diligence could not have known of defendants' actionable conduct until March 11, 1979.

Settlement also relieved plaintiff of difficult problems of proof as to damages. Plaintiff would have to establish that defendants' alleged omissions and misstatements depressed the share price and to what extent. This would require expert evidence perhaps hard for a jury to comprehend. Plaintiff contended that the measure of damages for each class member who sold shares of the Trust was the fair value of those shares during the class period minus the price at which the shares were actually sold during the class period. Based on this theory of damages, plaintiff originally asserted that the amount of damages suffered by the class was in excess of $4.5 million plus interest.

Defendants contested plaintiff's damage theory and argued that the proper measure of damages was only the amount of artificial depression, if any, in the market price of the Trust shares caused by whatever fraudulent misrepresentations or omissions there were at any given date during the class period. The measure of damages would then have been no more than the difference between the price at which the stock was actually trading on any given date during the class period and the price at which it would have been sold at the time had this unrevealed information been available. Whether damages were sus-

tained by the class, and if so, their precise amount, would have been difficult to prove so that settlement for damages certain in amount was beneficial to the class.

To summarize, if this case had gone to trial, it is far from certain that plaintiff the class would have been the prevailing party. In the present state of the law regarding the duty to disclose soft information, there is a possibility that plaintiffs would not have been able to establish a failure to disclose. Even if the class established liability, there still would have been difficult problems of proof on damages. Settlement allowed plaintiffs to avoid the risk involved in continuing to litigate against defendants.

### B. *Negotiation Process*

Although the court must independently evaluate the proposed settlement, the professional judgment of counsel involved in the litigation is entitled to significant weight. This agreement was negotiated by experienced counsel. Bernard Gross, Esquire, Eugene Spector, Esquire, and associates have successfully litigated class actions. They were personally involved in extended negotiations and the decision to accept the settlement agreement on behalf of the class was made after evaluation of all relevant factors, including the competence, experience and tenacity of opposing counsel.

### C. *Amount of the Settlement*

The court must review a settlement to determine whether it falls within a "range of reasonableness," not whether it is the most favorable possible result of litigation. *See Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.), *cert. denied sub nom., Benson v. Newman,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972) ("in any case there is a range of reasonableness with regard to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion"). The court in holding a hearing on the proposed settlement need not make a final determi-

nation on the merits. "It is not part of [the court's] duty in approving a settlement to establish that 'as a matter of legal certainty ... the subject claim or counterclaim is or is not worthless or valuable.'" *Flinn v. FMC,* 528 F.2d 1169, 1172 (4th Cir.), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976), quoting from *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 455 (2d Cir.1974). To do so would defeat the purpose of concluding a case by settlement rather than trial.

In light of the difficulties in establishing defendants' liability, it could be argued that any recovery by the class is in its best interest. But even if the court presumes liability, recovery is adequate in light of the difficulty of proving damages.

The recovery of $.50 per share is the same regardless of when the shares were sold. Although defendants deny liability, their expert witnesses agreed with plaintiffs that the damages sustained by the class, if any, were uniform. But had the case gone to trial, the court would have considered creating subclasses to ensure that the recovery of selling class members was commensurate with their losses; that is, to ensure that class members would recover the difference between the price at which the shares were sold and the price at which they would have been sold but for the concealment. Some members of the class might not have been able to prove any loss at all so that settlement for damages certain in amount is beneficial to them. Defendants have stated they would not have settled this case for more than $.50 per share so that creation of settlement subclasses would not increase the recovery of any class members. The claims filed do not exceed the amount of the settlement fund, so there is no need for a *pro rata* distribution and no conflict within the class; each class member will receive the maximum amount per share that the defendants are willing to pay. The uniformity of the recovery provided for in the settlement agreement is fair, reasonable and adequate.

The number of shares sold during the class period is not a matter of record. However, the parties agree that the maximum number is approximately 700,000. The $143,543 which will be distributed to the class represents 287,086 shares, approximately 41% of the shares sold during the class period. The number of shares participating in the distribution of the Settlement Fund is satisfactory.

### D. *Reaction of the Class*

Notice of the proposed settlement was mailed to class and published in *The Wall Street Journal;* brokers or nominees holding shares of the Trust for members of the class were ordered to forward notices to beneficial owners or supply counsel for the class with a list of the names and addresses of beneficial owners so that counsel could forward notices to them.

■ No member of the class has raised any objection to this proposed settlement. "[T]his unanimous approval of the proposed settlement by the class members is entitled to nearly dispositive weight in this court's evaluation of the proposed settlements." *In re Art Materials Antitrust Litigation*, 100 F.R.D. 367, 382 (N.D.Ohio 1983). Approximately 173 class members representing 301,651 shares filed claim forms. This demonstrates sufficient satisfaction with the results of the litigation. *See* discussion of percentage of claims filed in *Zimmer Paper Products, Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 92–93 (3d Cir.1985).

### E. *State of Proceeding*

This case has been pending for some time. The trial would be complex, expensive and might result in extended appeals because it presents novel issues regarding the duty to disclose soft information. It has settled at a stage of the proceedings that permits the parties and the court to evaluate realistically the risks of establishing liability and the extent of the relief that might be awarded after a trial. It is clear to the court that: 1) defendants will not agree to more favorable terms; and 2) the settlement is clearly within the range of reasonableness for plaintiffs when the likelihood of being the prevailing party and the recovery if the class prevails are considered. Therefore, after full consideration of all relevant factors, the court approves this settlement as fair, reasonable and adequate.

### III. *Attorneys' Fees and Costs*

### A. *Costs*

■ Petitioners are entitled under the settlement agreement to reimbursement of no more than $50,000 for such costs and expenses incurred in connection with the litigation as the court may allow. Petitioners jointly request costs to date in the amount of $44,852.

Petitioners claim the following expenses and costs:

| | | |
|---|---|---|
| 1. | Court costs (filing fees, sheriff and marshal service, opinions or order, docket entries) | $ 600.00 |
| 2. | Transcript | 1,763.87 |
| 3. | Witness fees | 25.00 |
| 4. | Travel, Food and Lodging | 1,586.38 |
| 5. | Long distance telephone, telecopier | 239.92 |
| 6. | Duplicating | 3,590.41 |
| 7. | Special Postage (special delivery air couriers, messenger service, etc.) | 851.84 |
| 8. | Professional Services (Experts) | 12,922.40 |
| 9. | Wall Street Journal (Publication of Notice of Proposed Settlement) | 11,648.73 |
| 10. | Printing Notices | 6,601.68 |
| 11. | Provocor/PNC Information Systems | 4,335.27 |
| 12. | Nominee reimbursement | 667.60 |

Petitioners' itemized costs and expenses actually total $44,834 not $44,852. All but $296.86 in expenses were incurred by lead counsel, Gross & Sklar, P.C.

Petitioners have provided the court with receipts for expenses incurred after September 9, 1985. No receipts have been provided for expenses incurred prior to that date. However, because of the court's familiarity with the case, the affidavits in support of the joint petition for attorneys' fees and disbursement are accepted and petitioners' are awarded costs as follows:

Gross & Sklar, P.C. $44,537.14
Thomas E. Eichman Assoc., P.C. $ 296.86

### B. *Attorneys' Fees*

Petitioners are entitled under the settlement agreement to reimbursement of no more than $135,000 for fees incurred in connection with the litigation as the court may allow. Petitioners jointly request fees in the amount of $135,000.

Under the "American Rule," each party to a lawsuit ordinarily bears its own attorneys' fees unless there is express statutory authorization to the contrary. *See Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983). *Alyeska Pipeline and Service Co. v. Wilderness Society*, 421 U.S. 240, 257, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1973); *Perichak v. International Union of Elec. Radio*, 715 F.2d 78, 79 (3d Cir.1983). One of the recognized exceptions to the American Rule is in the case of a so-called "common fund;" a person who maintains a lawsuit resulting in the creation, preservation or increase of a fund in which others have a common interest may be reimbursed from that fund for attorneys' fees and costs incurred. This avoids the unjust enrichment of those who would otherwise benefit from the fund without paying the litigation costs necessary to produce the fund. An attorney in a class action creating a common fund is entitled to compensation for his services from the fund created for the class but the amount is subject to court approval. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980); *See also Mills v. Electric Auto Lite Co.*, 396 U.S. 375, 391–92, 90 S.Ct. 616, 625, 24 L.Ed.2d 593 (1980). The rationale for recovery suggests a relationship to the amount of the fund created for the benefit of the class.

As stated by the Third Circuit Task Force of judges and lawyers appointed by Chief Judge Aldisert to study the award of attorney fees and make recommendations on the criteria to be utilized:

> ... a distinction must be drawn between fund-in-court cases and statutory fee cases since the policies behind the two categories differ greatly. The *Lindy* lodestar method, however, first developed and applied in the context of a fund-in-court case, has been transferred to the statutory fee environment with little attention to the differences between these two types of cases.[40]
>
> The purpose of the 'equitable fund,' 'common fund,' or 'fund-in-court' doctrine, enunciated by the Supreme Court over a century ago in *Trustees of the Internal Improvement Fund v. Greenough*,[41] is to avoid the unjust enrichment of those who benefit from the fund that is created, protected or increased by the litigation and who otherwise would bear none of the litigation costs. The rule also derives from the common-law concept that a trustee who is under a duty to act for others is entitled to be reimbursed from that fund for expenses incurred in administering the trust.[42]
>
> A key element of the fund case is that the fees are not assessed against the unsuccessful litigant (fee shifting), but rather are taken from the fund or damage recovery (fee spreading), thereby avoiding the unjust enrichment of those who otherwise would be benefited by the fund without sharing in the expenses incurred by the successful litigant.
>
> In sharp contrast to the fund-in-court cases are the substantial number of statutory causes of action....
>
> Rather than being based on the equitable notion that those who have benefited from litigation should share its costs, the legislative history of these fee acts makes it clear that the intent of Congress was to encourage private enforcement of the statutory substantive rights, whether they be economic or noneconomic, through the judicial process.

Report of the Third Circuit Task Force, October 8, 1985, pp. 13–15 (footnotes omitted). *Cf. Blum v. Stenson*, 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 1549 n. 16, 79 L.Ed.2d 891 (1984).

The Task Force agreed that the fundamental differences between statutory fee

and fund-in-court cases should be recognized in the fee-setting process:

> Of primary concern in dealing with fund-in-court cases is solving the problem raised when a class action lawyer secures a recovery for his clients and then proceeds to file a fee petition seeking compensation from those very same funds.[58] In these situations, the plaintiffs' attorney's role changes from one of a fiduciary for the clients to that of a claimant against the fund created for the clients' benefit. The perspective of the judge also changes because the court must now monitor the disbursement of the fund and act as a fiduciary for those who are supposed to benefit from it, since typically no one else is available to perform that function—the defendant has no interest in how the fund is distributed and the plaintiff class members rarely become involved. Note that neither of these concerns arise in the stautory fee context, which continues to be an adversary proceeding until resolution, except when a statutory fee case is 'converted' into a fund case by settlement.

> . . . . .

> Accordingly, the Task Force recommends that in the traditional common-fund situation and in those statutory fee cases that are likely to result in a settlement fund from which adequate counsel fees can be paid, the district court, on motion or its own initiative and at the earliest practicable moment,[60] should attempt to establish a percentage fee arrangement agreeable to the Bench and to plaintiff's counsel....

*Id* at 20–21 (footnotes omitted).

Although this is a common fund case, it differs from the usual one because under the terms of the settlement agreement, the fee will not detract from the fixed amount per share to which members of the class are entitled. Initially, defendants had the same interest as fee-shifting statutory defendants in contesting the amount of the fee because sums remaining in the fund after the per share distribution to the class and the award of fees and costs will be returned to defendants under the settlement agreement. However, now that defendants have agreed not to contest the fees requested if not in excess of $135,000, defendants have no interest in contesting the amount of the fees in that amount. Of course, when negotiating the settlement the amount to be paid in attorneys' fees determined in part the benefit to the class because defendants were interested in the total sum to be paid in settlement. Because defendants now have no interest in contesting the fee and because of the ethical conflict faced by petitioners in negotiating the class recovery and maximum fee award simultaneously, the court must apply the heightened judicial scrutiny mandated in common fund cases not only as fiduciary for the beneficiaries of the fund but in the interest of the administration of justice. *See* "The Prandini Problem," Report of the Third Circuit Task Force, October 8, 1985, at pp. 36–42. But *cf. Evans v. Jeff D.,* — U.S. —, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986). *See also In Re Fine Paper Antitrust Litigation,* 751 F.2d 562, 583 (3d Cir.1984).

The first step in awarding attorneys' fees in either a common fund or statutory fee case is calculating the "lodestar" by multiplying "the number of hours reasonably expended on the litigation ... by a reasonable hourly rate." *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983); *Ursic v. Bethlehem Mines,* 719 F.2d 670, 676 (3d Cir.1983). The party seeking attorneys' fees "bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941; *See also id.* at 438 n. 13, 103 S.Ct. at 1942 no. 13; *Black Grievance Committee v. Philadelphia Electric Company,* 615 F.Supp. 1069, 1072 (E.D.Pa.1985); *Hinckley v. E.I. DuPont de Nemours,* 583 F.Supp. 11, 13 (E.D.Pa.1983); *Heigler v. Gatter,* 463 F.Supp. 802, 804 (E.D.Pa.1978).

To substantiate the hours expended on particular litigation, the party seeking fees "should maintain billing time

records in a manner that will enable a reviewing court to identify distinct claims." *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941. The preferred method of establishing billable hours is by contemporaneous time records. *Id.* at 438 n. 13, 103 S.Ct. at 1942 n. 13.

■ To determine whether the number of hours claimed is reasonable, the general rule is that "hours that are not properly billed to one's client are also not properly billed to one's adversary...." *Id.* at 434, 103 S.Ct. at 1940. Furthermore, if a prevailing party achieved only limited success, the court may "identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Id.* at 436–37, 103 S.Ct. at 1941. The court may disallow claims for hours involving "matters of which the trial court has personal knowledge." *See Cunningham v. City of McKeesport,* 753 F.2d 262, 267 (3d Cir.1985).

■ A reasonable hourly rate is "calculated according to prevailing market rates in the relevant community regardless of whether plaintiff is represented by private or non-profit counsel." *Blum v. Stenson,* 465 U.S. 886, 895–96, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984); the applicable rate, however, is the " 'prevailing market rate' for priavate counsel of comparable experience, skill, and reputation." *Id.* at 892 n. 5, 104 S.Ct. at 1545 n. 5.

■ After the lodestar is calculated, the trial court must determine whether the lodestar should be increased or decreased because of the results obtained, the quality of the work performed, the contingent nature of the action, delay in obtaining payment or other special circumstances. *See Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102, 118 (3d Cir. 1976) *(en banc)* (*"Lindy II"*). *See also Cunningham,* 753 F.2d at 268.

The applicants filed their application for a fee jointly and request a single aggregate fee award. They allege that they worked on the litigation jointly and avoided duplicative efforts. Each law firm applicant filed an affidavit in support of the joint application including a description of the law firm, a summary of the number of hours spent by each individual in the firm by category and the normal hourly billing rate of each attorney. The total lodestar is $235,112.50. The fee requested, $135,000, is less than the lodestar and no fees are requested in connection with renegotiation of the settlement, administration of the settlement fund, or preparation of the fee petition.

Petitioners have organized their activities into ten categories: (1) pleadings and briefs; (2) research; (3) depositions; (4) documentary discovery; (5) other discovery; (6) court appearances; (7) settlement; (8) settlement procedures and administration; (9) meeting of counsel; and (10) conferences with clients. The fee petition states the number of hours expended in each area and includes a general description of the tasks performed. Petitioners have not provided the court with their time records so that it is difficult for the court to identify distinct claims with precision or to determine whether there were duplicative efforts as a consequence of the joint representation.

It appears there may have been some duplicative efforts as a consequence of unnecessary joint representation; for example, both firms prepared Mr. Fickinger for his deposition. But the firm of Gross & Sklar, P.C., lead counsel, performed most of the legal services in connection with the case and the lodestar of the firm of Thomas E. Eichman Associates, P.C., is only in the amount of $36,760. Since petitioners' fee request is $100,000 less than the combined lodestar, determining the extent of duplicative hours is unnecessary because fees for duplicative hours, if any, will not

be awarded. Otherwise, the hours do not appear to have been spent inefficiently. The attorneys' billing rates are comparable to the hourly rates of other Philadelphia law firms for attorneys of equal stature and experience. Therefore, the lodestar is accepted as the total of the reasonable hours devoted to the case multiplied by the reasonable billing rates of counsel.

But calculating the lodestar is only the first step performed in awarding attorneys' fees, especially in a common fund case. The court must consider increasing or decreasing the lodestar because of any special circumstances, including the results obtained, quality of work performed, contingent nature of the action, and delay in obtaining payment. Factors that may be considered in fee determination are summarized in the American Bar Association's Code of Professional Responsibility, D.R. 2–106 (1980); Local Rule 14, IV B. *See also* "Court Awarded Attorneys' Fees," Report of the Third Circuit Task Force, October 8, 1985, at pp. 3–8.

 The burden of showing an upward adjustment to the lodestar is upon the applicant. *Blum v. Stenson,* 465 U.S. 886, 898, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984); *Institutionalized Juveniles v. Secretary of Public Welfare,* 758 F.2d 897, 922 (3d Cir.1985); *In Re Fine Paper,* 751 F.2d at 385. Petitioners seek no positive multiplier. Nevertheless, the court has considered whether an upward adjustment would be warranted by factors relevant under *Lindy,* that is, the contingent nature of the action, the delay in obtaining payment and the quality of the work performed.

In determining whether to increase the lodestar to reflect the contingent nature of success, "the district court should consider any information that may help to establish the probability of success." *Lindy Bros. Builders, Inc. of Philadelphia v. Ameri-*

*can Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 168 (3d Cir.1978) ("*Lindy I*"). But "the court may find that the contingency was so slight or the amount found to constitute reasonable compensation for the hours worked so large a proportion of the total recovery that an increased allowance for the contingent nature of the fee would be minimal." *Id.*

Here, the actual distribution to the class is only the sum of $143,543. While the contingency was considerable rather than slight, this is the paradigm case where the lodestar is so large a proportion of the total recovery that an increased allowance for contingency must be minimal. An upward adjustment would make the Settlement Fund a fund for counsel for the class rather than a fund for the class. For the same reason, the delay in obtaining payment cannot justify an increase in the lodestar, but it does require an upward adjustment in the amount that would otherwise be awarded.

Nor does the quality of the work justify an upward multiplier. The quality multiplier is to be employed only for "an unusual degree of skill, superior or inferior, exhibited by counsel in the specific case before the court." *Silberman v. Bogle,* 683 F.2d 62, 64 (3d Cir.1982). This is because the general quality of the attorney's practice and reputation is already considered in determining the reasonable hourly rate. *Id.* at 64. Petitioners' lodestar reflects adequately the quality of their work so that no upward adjustment would have been necessary.

The focal point of the *Lindy* standard is the purpose of the common fund fee award, that is, compensation of attorneys for services benefiting the plaintiffs. The class does not benefit from the funds returned to the defendants. The settlement agreement

could have ensured that the entire fund benefited the class, even if the fund were lesser in amount. For example, the measure of recovery per share could have been a sum certain divided by the number of qualifying shares less court awarded fees and costs. It is clear that the parties anticipated that the class would not benefit from the entire fund when they agreed to a return of some funds to defendants. It is also clear that defendants based their agreement to settle on the total amount of the stipulated payment. Under these circumstances, the attorneys' fee should be proportional to the actual recovery of the class as is the case of the contingent fee to which the common fund award is akin.

Were the court to award petitioners attorneys' fees in the sum of $135,000, their recovery would be disproportional to the sum actually distributed to the class, $143,543. Attorneys' fees in the sum of $135,000 would be, in effect, 48% of what defendants have agreed to pay to settle the case, apart from costs. Petitioners contend their requested fee is only 22.5% of the settlement fund so that it is proportional to the recovery of the class. However, for the reasons previously stated, the attorneys' fee must be based on the actual recovery of the class, not on the amount of the fund. Therefore, a downward adjustment to the lodestar is required.

The court's award of a counsel fee proportional to the actual recovery of the class does not, as petitioners contend, penalize their expeditious administration of the settlement fund. Under the original terms of the settlement agreement, petitioners requested a fee in the sum of $200,000 from a supposed settlement fund of $600,000 notwithstanding that they then knew that the distribution to the class would have been less than $11,000 if the settlement were approved. When the court learned that the terms of the settlement agreement provided an insufficient benefit to the class, it refused to approve the proposed settlement agreement. The parties then renegotiated a settlement more favorable to the class. In the unusual circumstances created by the settlement terms in this case, including the distribution under terms originally proposed, the court could not consider any fee request until the actual amount to be distributed to the class was known so that petitioners' expeditious administration of the fund was in their best interests.

A study of attorney fee awards in common fund cases presented by the then United States District Judge Thomas A. Masterson at the 1977 Third Circuit Judicial Conference, revealed judicial awards ranging from 20–25% of the common fund regardless of type of case, benefits to the class, number or hours billed, size of fund, size of class, or other relevant factors. "Court Awarded Attorneys Fees," Report of the Third Circuit Task Force, October 8, 1985, at p. 10 n. 31. An attorneys' fee in the amount of $35,886 is 20% of what the defendants agreed to pay to settle this case, apart from costs. This would be a reasonable fee to apply were it not for the fact that the court also must take into account to some extent the contingent nature of success and the considerable delay in receiving counsel's receipt of payment in determining the appropriate attorneys' fee.

A reasonable contingent fee generally applied by this court when approving the counsel fees deducted from awards for minors and incompetents is no more than 33⅓%. Therefore, the court awards petitioners attorneys' fees in the amount of 33⅓% of the total sum defendants agreed to pay to settle this case (apart from costs), or $71,772. The sum distributed to the class will then be 66⅔% of the amount defendants will pay in settlement.

The court realizes and regrets that in this case reducing the fee not objected to

by the defendants will decrease the total amount paid by them in settlement. But common fund awards are not intended to reward a Don Quixote who tilts at windmills no matter how noble the motives or how extensive the efforts. A reduced award recognizes the weakness of plaintiffs' claim and the consequent limitation on the amount of possible recovery. To award a greater fee would encourage prolonging frivolous litigation not for the benefit of the class but for counsel. Only by approving this fee award proportionate to the benefit of the class can the court exercise its proper supervisory role under Fed. R.Civ.P. 23.

Therefore, the court awards the petitioners Gross & Sklar and Thomas E. Eichman Associates, P.C. a joint counsel fee in the amount of $71,772 in the same proportion as the historic lodestar figures submitted in support of the application, which were respectively 84% and 16% of the total:

| | |
|---|---|
| Gross & Sklar, P.C. | $60,288 |
| Thomas E. Eichman Associates, P.C. | $11,484 |

An appropriate Order will issue.

### ORDER

AND NOW, this 4th day of June, 1986, upon consideration of the motion to approve the settlement of this class action, it appearing that:

a. The terms of the settlement agreement are fair, reasonable and adequate to the class.

b. All class members have been served with notice of the proposed settlement agreement and the hearing thereon, either directly or by publication in accordance with the court's Order of April 10, 1986 directing same.

c. Notice by mail and publication was the best practicable in the circumstances.

d. A hearing was held on May 19, 1986 at which no class members appeared to object.

e. No written objections to the settlement have been filed.

Therefore, for the reasons set forth in the foregoing Memorandum, it is ORDERED that:

1. This settlement is APPROVED on behalf of the following class, except all members who have previously excluded themselves and are listed in Exhibit A attached hereto:

All shareholders of the Trust who, prior to November 29, 1977, had acquired shares of the Trust and who, during the period November 29, 1977 through August 30, 1979, sold those shares, excluding the defendants and any affiliates, subsidiaries, officers, directors and/or managing agents thereof.

2. Each plaintiff and member of the class who did not timely exclude itself is deemed to have agreed forever to refrain from proceeding against the defendants, their successors, assigns, affiliates, subsidiaries, predecessors, and any and all of its present and former directors, employees and agents, on any claims and causes of actions which have been, might have been, are now or could be asserted in this action, and which are based upon allegations of failure to disclose and to accurately represent the value of assets and projected earnings for the Trust under the Securities Exchange Act, the regulations thereunder and the common law.

3. Without affecting the finality of this judgment in any way, this court reserves jurisdiction over the implementation of this settlement, including approving a final plan of distribution, resolving disputed claims by any class members, and awarding attorneys' fees and additional expenses.

4. In accordance with the court's findings herein, the Clerk of this Court is directed to enter final judgment pursuant to Fed.R.Civ.P. 54(b).

EXHIBIT A

1. Gertude Zaffarano
 215 Hibbard Avenue
 Horseheads, NY 14845

2. Edith Schreiber
 1540 Euclid Avenue
 Miami Beach, FL 33139

3. Harold R. Schrier
 1320 S.E. 4th Court
 Deerfield Beach, FL 33441

4. Ted B. Tom
 930 Pembroke Road
 Fayetteville, AR 72701

5. Mary A. Reynolds
 663 Las Casas Avenue
 Pacific Palisades, CA 90272

6. John O. Heintz
 409 S. Jucerne Boulevard
 Los Angeles, CA 90020

7. Lloyd B. Howell
 Bertha M. Howell
 Lawrenceville, PA 16929

8. Arline P. Bowsner
 P.O. Box 1824
 Ormond Beach, FL 32074

9. John & Anna Graf
 2090 Oriole Lane
 S. Daytona, FL 32019

10. Archie Rose
 534 So. Galect
 Brigham City, UT 84302

11. Lillian Fredericksen
 804 C Royal Palm Way
 Ft. Pierce, FL 33449

12. Mrs. Judy S. Black
 30 Woodlily Lane
 Fairport, NY 14450

---

## DISTRIBUTION ORDER

The court, having approved the settlement of this class action and a Final Judgment and Order having been entered; and having considered the affidavits of Jay Sacks Cohen dated May 16, 1986 and June 2, 1986, together with the exhibits thereto, with respect to plaintiff's counsel's administration of the settlement of this class action, including recommendations as to the allowance and disallowance of claims; the claimants having been given notice and an opportunity to be heard with respect to the disallowance of claims, and a hearing thereon having been held on June 2, 1986, and no objections to the disallowance of claims having been raised, it is on this 4th day of June, 1986 ORDERED;

1. The reports and recommendations of plaintiff's counsel with respect to settlement administration, including the allowance and disallowance of claims, are hereby adopted and approved by the court.

2. Each of the claims recommended for allowance, in whole or in part, by plaintiff's counsel, as set forth in Exhibit A to the affidavits of Jay Sacks Cohen, dated June 2, 1986 (the "Distribution List"), is hereby allowed in the amount set forth in the Distribution List, including all claims postmarked on or before May 30, 1986 ("Allowed Claims"). The total dollar amount of Allowed Claims is $143,543.00, representing 287,086 shares. No claims other than those set forth and recommended for allowance in the Distribution List shall be allowed, except those postmarked on or before May 30, 1986 and recommended for allowance by plaintiff's counsel.

3. Each of the claims recommended for disallowance and rejection, in whole or in part, by plaintiff's counsel, as set forth in the Distribution List, is hereby disallowed.

4. Class members who have not submitted proofs of claim postmarked on or before May 30, 1986, or whose claims are disallowed, in whole or in part, pursuant to paragraph 3 hereof, are hereby barred from any recovery in connection with the settlement herein and are bound by the terms and provisions of the Final Judgment and Ordered entered herein.

5. Pursuant to the settlement agreement approved by the court on this day, defendants shall deposit the sum of $600,000 in an interest bearing escrow account or accounts established by plaintiff's counsel at the Provident National Bank ("Settlement Accounts") within ten (10) days after

the entry of the Final Judgment and Order herein.

6. As soon as practicable following the effective date of the settlement, plaintiff's counsel shall cause the above-mentioned sums to be distributed as follows:

a. $143,543.00 shall be distributed to claimants with Allowed Claims, in the amounts set forth in the Distribution List as supplemented by plaintiff's counsel;

b. $71,772.00, together with accrued interest thereon, shall be distributed to plaintiff's counsel in payment of fees as awarded by the court; and

c. $44,834.00, together with accrued interest thereon, shall be distributed to plaintiff's counsel in payment of expenses as awarded by the court.

7. Plaintiff's counsel may thereafter apply to the court, upon notice to defendants, for reimbursement of additional expenses, if any, incurred by them in connection with the settlement. The total reimbursement of expenses shall not exceed $50,000.00, together with accrued interest thereon.

8. Not later than thirty (30) days following the distributions, if any, pursuant to paragraph 6 and paragraph 7 hereof, plaintiff's counsel shall file with the court and serve on defendants' counsel a final report with respect to administration of the settlement and distribution of the proceeds thereof so that the court may then order all sums then remaining in the Settlement Accounts, together with accrued interest thereon returned to defendants.

9. Upon compliance with paragraph 8 hereof, plaintiff's counsel shall be discharged from all further responsibility with respect to the administration of the settlement.

10. In the event that the settlement is not consummated for any reason whatsoever, all sums deposited by defendants pursuant to this Order, together with accrued interest thereon, shall promptly be returned to defendants.