**METROPOLITAN PITTSBURGH CRUSADE FOR VOTERS, and unincorporated membership organization, Thomas E. Smith, Florence Bridges, Roy A. Holmes, Reginald D. Plato, Isaac J. Saxon, Claude J. Jones, Isaac Wade, Ronald L. Suber, and Marshall Ross, Plaintiffs,**

**v.**

**CITY OF PITTSBURGH, PENNSYLVANIA, a municipal corporation; Richard Caliguiri, Mayor, Eugene Depasquale, Ben Woods, Mark Pollock, Sophie Masloff, Michell Madoff, Richard Givens, Stephen Grabowski, Jack Wagner, James O'Malley, members of the Pittsburgh City Council; Allegheny County Board of Elections; Tom Foerster, Pete Flaherty, Barbara Hafer, Commissioners: Allegheny County Democratic Committee: Edward Stephens, Chairman; Allegheny County Department of Elections; James Scanlon, Director, Defendants.**

Civ. A. No. 86–173.

United States District Court, W.D. Pennsylvania.

May 18, 1988.

Thomas J. Henderson, Pittsburgh, Pa., William L. Robinson, Lawyers Committee for Civil Rights Under Law, Washington, D.C., for plaintiffs.

Robert L. Byer, Pittsburgh, Pa., for Republican City Committee and Robert Binnie.

Allan J. Opsitnick, Pittsburgh, Pa., for Allegheny County Bd. of Elections, Tom Foerster, Pete Flaherty, Barbara Hafer, Com'rs and Allegheny County Bd. of Elections, James Scanlon, Director.

Robert B. Smith, Ass't City Solicitor, Pittsburgh, Pa., Vincent R. Fontana, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, for City of Pittsburgh, etc.

John F. Cambest, Pittsburgh, Pa., for Allegheny County Democratic Committee.

## OPINION

ZIEGLER, District Judge.

Pending before the court is the question whether the decision of class counsel, with the apparent support of an overwhelming number of class members, to forego additional litigation and support the apportionment plan of the Pittsburgh Apportionment Commission, as an interim settlement of the underlying claims, is fair, adequate and reasonable. We hold that the proposed class action resolution is substantively reasonable compared to the likely rewards of litigation and that the decision of counsel and the class to forego further litigation and await the results of the 1990 census is fair, adequate and reasonable.

### I. *History of Case*

This is a civil action for injunctive relief to restrain defendants from conducting future elections for Council of the City of Pittsburgh on an at-large basis and for declaratory relief to establish election by districts. Jurisdiction is based on the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, and the Fourteenth and Fifteenth Amendments to the Constitution.

Plaintiffs are black citizens, residents and registered voters of Pittsburgh, Pennsylvania. In their complaint, plaintiffs allege that the at-large city-council elections have been and continue to be maintained for the purpose and effect of preserving racial and political supremacy. According to plaintiffs, the result has been a dilution of the voting strength of plaintiffs and those similarly situated in violation of rights guaranteed by federal law. The court certified a class of over 100,000 black citizens and residents of the City of Pittsburgh, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure.

In their complaint and pre-trial narrative statement, plaintiffs contend that the at-large system has denied black citizens an equal opportunity to participate in the political process and to elect representatives of their choice. According to plaintiffs, Pittsburgh is governed by an all white council of nine members, despite the fact that blacks comprise "roughly 25 percent of the population of Pittsburgh" and that qualified black persons were unsuccessful candidates for many years, including 1983 and 1985, when the current all white council was elected.

On May 19, 1987, and prior to trial of the instant case, the voters determined by initiative and referendum to abolish the at-large election of council members in the City of Pittsburgh.[1] Pennsylvania law provides that a commission shall be appointed once the electorate votes to revise the at-large method of electing council members, and "the initial apportionment of the districts shall be made by an apportionment commission consisting of seven members, all of whom shall reside in such municipality." 53 P.S. § 1–221(d).

The parties responded to these political developments by executing a stipulation on June 10, 1987 which provides that:

1. The Apportionment Commission shall hold public hearings, receive evidence and submit a "final apportionment proposal" to the court on or before February 15, 1988;

2. The court shall retain jurisdiction and conduct an evidentiary hearing to determine whether the proposal meets the requirements of federal law;

3. If no objections to the proposal are filed, or if filed and rejected by the court, the court shall issue an order approving the plan as submitted;

4. In the event the court finds that valid objections have been presented, the court may enter an order requiring the commission to submit a further plan, or enter any order in accordance with federal law;

5. Plaintiffs shall retain the right to seek counsel fees in a subsequent proceeding on the basis that they are the prevailing parties; and

6. Defendants shall reserve the right to assert defenses and challenge the claim that plaintiffs are the prevailing parties.

The Apportionment Commission conducted public hearings at locations throughout the city, received evidence and advice from numerous citizens, and considered various proposals. *See* Minutes of the Pittsburgh Apportionment Commission. The Commission voted (5–2) to adopt a plan that divides the City of Pittsburgh into nine districts "of as equal population as is practicable and districts which give weight to minority residents," with one elected representative for each district. The majority members of the Commission concluded in a timely submission to the court that:

The Plan submitted by the Commission presents a district alignment which contains districts which are compact, contiguous, as equal in population as is practi-

---

1. Two questions were submitted to the electorate in the May primary election:

Shall Section 302 of the Pittsburgh Home Rule Charter be amended to provide for the election of council members by district only and read as follows: Council shall consist of nine members. All members shall be elected by districts. Each of the districts shall be represented by one member who shall reside in that district?

Shall Section 302 of the Pittsburgh Home Rule Charter be amended to provide for at-large elections for all council members and read as follows: Council shall consist of nine members. All council members shall be elected at large by qualified electors of the city at a municipal election?

cable, and which do not discriminate against any resident in this City. The map features two (2) predominately black districts and generally respects natural boundaries and neighborhood boundaries.

Apportionment Commission Plan at 3.

The two black members of the Commission dissented. They contended that the majority failed to adequately utilize the population data from the 1980 census, "which contains an acknowledged under count;" limited the opportunities and political participation of "one third of this city's population;" and polarized the City into racial and political enclaves in violation of federal law. Minority Report at 2.

The court ordered that all objections to the plan must be submitted in writing on or before March 1, 1988, and supported by a brief. On March 1, 1988, Thomas J. Henderson, Esquire, counsel for the class, filed a "Response to the Districting Proposal" noting that "with implementation of this apportionment plan, the City's black population will no longer be disenfranchised and, in fact, will be represented on City Council in proportion to its percentage of the total population, at present, as reflected in the 1980 census." Counsel concluded that "plaintiffs do not oppose the adoption of the Commission proposal as the resolution of this lawsuit at this time."

A hearing was held on March 17, 1988 with respect to the objections. Florence Bridges, a named plaintiff, filed a timely objection and presented evidence at the hearing.

On March 17, 1988, the court ordered that a second hearing would be held on April 20, 1988, with respect to any additional objections as well as the proposed compromise settlement of class counsel. Notice was given to the class in all local newspapers of general circulation.

Reginald D. Plato filed an objection but did not appear at the hearing. Florence Bridges filed an additional objection and offered evidence to support her contentions that (1) the Apportionment Commission erred when it created two rather than three districts in which black citizens constitute a majority, and (2) several of the districts are not "as equal in population as is practicable," as claimed by the Commission.

II. *The Relevant Legal Test*

Plaintiffs contend that the apportionment plan violates Section 2 of the Voting Rights Act of 1965, as amended on June 29, 1982. Our starting point must be the statute itself. Section 2 reads as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision in one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

The Senate Judiciary Committee articulated six "typical factors," and two "additional factors" that may be probative of a Section 2 violation when it amended the Act in 1982. S.Rep. No. 417, 97th Cong., 2d Sess. 19 (1982), 1982 U.S.Code Cong. & Admin.News 177, 196. The Supreme Court has acknowledged the relevance of these guidelines in determining the totality of the circumstances, *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), and concluded that to establish a violation of Section 2 plaintiffs must estab-

lish that (1) they are sufficiently large and geographically compact to constitute a majority in a single-member district; (2) they are politically cohesive; (3) the white majority voting bloc usually defeats the minority's preferred candidate; and (4) a pattern occurs over time. *Id.* 106 S.Ct. at 2766–67.

While *Thornburg* dealt with a multimember electoral structure that violated Section 2, the Court noted that "dilution of racial minority voting strength may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters *or from the concentration of blacks into districts where they constitute an excessive majority.*" 106 S.Ct. at 2764, fn. 11. (Emphasis ours.) In the instant case, the objectors assail the concentration of blacks into two districts, namely, District 6 (63.9%) and District 9 (78.6%).

The Court of Appeals for the Third Circuit has articulated the relevant test in determining whether the settlement of a class action is fair and reasonable. In *Girsh v. Jepson,* 521 F.2d 153 (3d Cir.1975), the court directed the district courts to consider these factors:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery; and

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* at 157.

Factors 1, 2, 4, 8 and 9 support the response of class counsel.[2] This is a com-

plex piece of litigation in which defendants are prepared to contest and litigate the claims of plaintiffs in this court and various appellate courts if necessary. Additional delay will be encountered if we remand to the Apportionment Commission, as uged by the objectors. Moreover, defendants are arguably prepared to establish that (1) the prior election scheme of the City of Pittsburgh has produced several black councilmen; (2) a black candidate is assured of election in November; (3) the abolition of the at-large election system by the electorate moots the underlying declaratory and injunctive claims; and (4) the Commission's plan of districting comports with federal law and is consistent with the percentage of black citizens of the City of Pittsburgh, as established by the 1980 census. As a result, we hold that the complexity, duration, reaction, risk and reasonableness factors support the decision of plaintiffs' counsel to forego additional litigation until the current and precise percentage of black citizens of the City of Pittsburgh is determined by the next census—only two years hence.

Factor 2 bears special mention. Only one objector appeared to challenge the apportionment plan, although the class consists of over 100,000 persons and every reasonable effort was made to advise the class of the position of class counsel. Two hearings were held and, at one, William Robinson, a prominent black member of the Commission and one of the original dissenters, appeared and supported the position of class counsel. Harvey Adams, the other black member, never filed an objection.

One court has held that "the reaction of the class to the settlement is perhaps the most important factor to be weighed in considering the adequacy of a proposed class action settlement." *Weisberg v. Toll Bros., Inc.,* 617 F.Supp. 539, 542 (E.D.Pa. 1985). Unanimous approval of the proposed settlement by the class members is nearly dispositive. *Fickinger v. C.I. Plan-*

---

**2.** Factors 5 and 6 are inapplicable to this litigation. Factor 3 is applicable but not controlling

because discovery is complete with respect to plaintiffs' motion for a preliminary injunction.

*ning Corp.,* 646 F.Supp. 622, 631 (E.D.Pa. 1986). While we acknowledge our authority to reject any settlement, despite the agreement of the parties, we are satisfied that class counsel has charted a prudent course, under the circumstances.

The professional judgment of class counsel is also entitled to significant weight. Thomas Henderson is a prominent practioner at our bar with experience in protecting the civil rights of minorities and the poor. He is intimately familiar with the facts in this case, the risks involved, and the likelihood of expanded relief, if any. The opinion of a competent professional in a matter of importance to the class and this community should not be lightly disregarded.

We turn now to the objections of Florence Bridges and Reginald D. Plato. The objectors complain that the Apportionment Commission failed to establish three districts in which black citizens constitute a majority, rather than two, and thereby diluted the ability of minorities to elect candidates of their choice. Defendants rejoin that the percentage of black districts created by the Commission is consistent with the percentage of black and minority persons in the City of Pittsburgh as established by the 1980 census.

We can fault neither the Commission nor the decision of class counsel under the circumstances. The Commission's plan is consistent with the only reliable data available and, equally important, it adheres to the 65 percent rule endorsed by several courts, *Mississippi v. United States,* 490 F.Supp. 569, 575, (1979), *aff'd mem.,* 444 U.S. 1050, 100 S.Ct. 994, 62 L.Ed.2d 739 (1980), and the Department of Justice in Section 5 submissions. Parker, *Racial Gerrymandering and Legislative Reapportionment,* Minority Vote Dilution (C. Davidson ed. 1984).

While the objectors' proposal has superficial appeal, any plan that creates three districts with slim majorities of black citizens in total population may actually be majority-white in voting-age population.

Experience teaches that the black voting-age population is often less than the total black percentage while the white voting-age population may be more than the total white percentage. *Id.* at 109–110. Further, one court found that 63 percent of the white voting-age population was registered to vote, compared with only 49 percent for blacks. *Ibid.* Hence, the plan urged by the objectors may pose grave risks to any black candidate that aspires to serve on City Council and it may preserve that which the objectors seek to abolish.[3]

While the rule of 65 is not cast in stone, and may be of small value when tested against a subsequent plan based on 1990 census data, we cannot conclude on the basis of the meager evidence presented by the objectors that the plan of the Apportionment Commission constitutes packing, racial gerrymandering or otherwise violates federal law. The resolution proposed by class counsel was made in good faith and without collusion, and we hold that it is fair, adequate and within a range of reasonableness. The test is not "the most favorable possible result" obtainable. *Fickinger v. C.I. Planning Corp.,* 646 F.Supp. 622 (E.D.Pa.1986).

Florence Bridges next contends that the population figures per district promulagated and relied upon by the Commission are inaccurate. She contends that the actual population in five districts varies from a low of 1.1% in District 4 to a high of 26.5% in District 3, when compared to the population figures in the plan. Apportionment Commission Plan at 3–4. The objector's calculations are based on a 1980 survey of the population per neighborhood. *See,* Bridges Exhibit at 1.

As counsel for the City points out, Miss Bridges apparently relied on the neighborhoods referred to in the Commission's plan at pages 3 and 4, and then added the population per neighborhood as provided in the survey. However, the reference to neighborhoods in the plan was for descriptive purposes only and was not the precise basis

---

**3.** "[M]inorities frequently must constitute at least 65 percent of the population or 60 percent of the voting age population of districts in order to have an equal opportunity to elect candidates of their choice." *Id.* at 111.

on which the Commission relied to calculate population per district.

The Commission correctly relied on the population figures of the Legislative Data Process Center of the Commonwealth of Pennsylvania to determine the population per ward and election district. A ward in Squirrel Hill and Bloomfield, for example, may appear in one district and another ward in the same neighborhood may appear in another district. Miss Bridges erred when she assumed that all wards in the same neighborhood are in the same district.

A careful review of exhibits attached to the letter brief of counsel for the City dated April 21, 1986 reveals the accuracy of the Apportionment Commission's figures. The objections of Florence Bridges will be denied.

■ The final issue that we must address concerns whether we should dismiss the action with prejudice, as urged by defendants, or permit plaintiffs to re-open the case on motion if the 1990 census establishes that the City has been malapportioned in violation of federal law. In our judgment, the parties should not be required to duplicate the expense of filing fees, pleadings, briefs, motions, depositions, expert witnesses and counsel fees if the 1990 census establishes that the black population of the City exceeds 24%, and the districts are malapportioned, and City Council fails to take remedial action. This is especially so when the public fisc is involved.

The parties agreed on June 10, 1986 that "[t]his Court shall have continuing jurisdiction of this matter" and it is clear that class counsel's recommendation to forego additional litigation is predicated on the belief that the present black population substantially exceeds 24%, although proof is not yet at hand.

Under the circumstances, we agree with class counsel that the prudent and least expensive course for all parties to pursue is to permit plaintiffs to re-open the case on motion if a justiciable controversy exists following the 1990 census.

A written order will follow denying all objections and approving the compromise, settlement and resolution proposed by class counsel.

### ORDER OF COURT

AND NOW, this 18th day of May 1988,

IT IS ORDERED that the objections of Florence Bridges, Reginald D. Plato, Robert Anderson, Mary Virginia Kelly and David Pahnos be and hereby are denied.

IT IS FURTHER ORDERED that Plaintiffs' Response to the Districting Proposal of the Pittsburgh Apportionment Commission be and hereby is granted.

IT IS FURTHER ORDERED that the motion of class counsel to approve the compromise, settlement and resolution of this class action on the terms and conditions set forth in the accompaning opinion be and hereby is granted.