Mariann S. MASHBURN, et al., Plaintiffs,

v.

NATIONAL HEALTHCARE, INC., a corporation; et al., Defendants.

Civ. A. No. 87–D–0070–S.

United States District Court, M.D. Alabama, S.D.

April 8, 1988.

than, Ala., for Nat. Healthcare, Inc., William H. Cassels, Thomas C. Shepard, Charles E. Baxter, James R. Stephenson & John S. Schwart.

Thad G. Long, J. Barry Jones, Bradley, Arant, Rose & White, Birmingham, Ala., for L. Stanton Tuttle.

Henry B. Gutman, Charles E. Bachman, John S. Beckerman, O'Sullivan Graev & Karabell, New York City, Robert W. Bradford, Jr., Hill, Hill, Carter, Franco, Cole & Black, Montgomery, Ala., for Robert F. Higgins, Howard C. Landis, Anders K. Brag, Regional Financial Enterprises, L.P., Regional Financial Enterprises II, L.P., Charles River Partnership V, Hambro Intern. Venture Fund, and Hambro Intern. Venture Fund Offshore.

Robert M. Brinson, Brinson, Askew & Berry, Rome, Ga., for Tom E. Greene, III, Med Capital Investors, Greene Family Trust and Healthtech Investors II.

Dan F. Laney, III, C.B. Rogers, Richard H. Sinkfield, Rogers & Hardin, Atlanta, Ga., for Stephen L. Phelps.

George G. Lynn, A. Inge Selden, III, Luther M. Dorr, Jr., Maynard, Cooper, Frierson & Gale, Birmingham, Ala., for Joseph D. Bohr, Jr., Dale R. Mulder, Jay Russell.

Frank M. Wilson, Beasley, Wilson, Traeger, Allen & Mendelsohn, John M. Pappanastos, Susan Shirock DePaola, Pappanastos & Samford, Montgomery, Ala., for Drexel Burnham Lambert Inc., Bear, Stearns & Co. Inc., Robertson, Colman & Stephens.

Robert D. Segall, Copeland, Franco, Screws & Gill, Montgomery, Ala., for Mont–Med Associates.

Thomas S. Lawson, Jr., J. Lister Hubbard, James N. Walter, Jr., Capell, Howard, Knabe & Cobbs, Montgomery, Ala., for Curtis L. Adams, Scott W. Bauman, Robert E. Johnstone and Charles G. Taylor.

James D. Farmer, Farmer & Farmer, Dothan, Ala., for Holders of Subordinated Debentures.

Paul W. Brock, W. Ramsey McKinney, Rayford L. Etherton, Jr., Hand, Arendall,

Rufus Smith and Edward Price, Jr., Farmer, Price & Smith, Dothan, Ala., Edward L. Hardin, Jr., Hardin & Hollis, J. Michael Rediker, David J. Guin, David R. Donaldson, Ritchie & Rediker, Birmingham, Ala., for plaintiffs.

Kenneth L. Millwood, John L. Latham, Smith, Gambrell & Russell, Atlanta, Ga., Alan C. Livingston, Lee & McInish, Do-

Bedsole, Greaves & Johnston, Mobile, Ala., for Wood, Lucksinger and Epstein.

Thomas W. Thagard, Jr., Michael L. Edwards, Balch & Bingham, Birmingham, Ala., Eugene R. Erbstoesfer, Associate General Counsel, Arthur Young and Co., New York City, for Arthur Young & Company.

J. Vernon Patrick, Patrick & Lacy, P.C., Birmingham, Ala., for National Healthcare, Inc.

## MEMORANDUM OPINION

DUBINA, District Judge.

There is presently pending in this cause a joint application by class counsel for an award of attorneys' fees and reimbursement of expenses.[1] In their petition, class counsel jointly make application to this Court on behalf of all firms who represented the plaintiff class for an aggregate award of $3,400,000 in attorneys' fees and expenses to be paid out of the settlement fund created for the class through the efforts of said counsel. Any fees and expenses awarded by this Court shall be payable from the aggregate of approximately $17,425,000 gross amount of settlement proceeds to be paid into this Court, which sum does not include interest to be earned on the settlement funds to the date of distribution. Class counsel request the Court that the total sum of the fees and expenses be awarded in the aggregate for all three firms, which amount shall then be allocated among the firms by agreement of counsel. Class counsel further request that the $3,400,000 in aggregate fees and expenses be awarded upon final approval of the settlement of this case and that distribution of such fees and expenses be allowed on the 31st day after a final judgment is entered in this cause by the Court pursuant to Rule 54(b) of the *Federal Rules of Civil Procedure*, provided that no appeal or motion for rehearing by a party to this cause has been timely filed and/or perfected.

In support of their joint application, class counsel submitted separate detailed affidavits of J. Michael Rediker, Esq.; David J. Guin, Esq.; David R. Donaldson, Esq.; the Honorable Carolyn L. Duncan; Edward L. Hardin, Esq.; R. Randy Smith, Esq.; and Ed Price, Esq., as to services rendered and litigation expenses incurred respectfully by the plaintiffs' class law firms, with listing of hours and/or matters accomplished, and summaries as to their respective backgrounds. Additionally, at the final hearing on the proposed settlement conducted by the Court on February 29, 1988, the plaintiffs submitted testimony from numerous witnesses concerning the reasonableness of the settlement and the amount of attorneys' fees and expenses class counsel are requesting this Court to award. These witnesses included well-regarded attorneys-at-law and even one former judge.[2] It is significant to this Court that every witness who testified at the final settlement hearing stated that the proposed settlement was fair and the amount of attorneys' fees and expenses requested by class counsel was reasonable. No one appearing at the final settlement hearing had any objection to the amount of attorneys' fees and expenses class counsel are seeking herein. Indeed, the Court inquired specifically of counsel representing the "Maddox Class," who did appear for the purpose of making an objection to the proposed final settlement, whether he or any of his clients had any objection to the application for attorneys' fees. Counsel for the "Maddox Class" stated that he and his clients had no such objection and were of the opinion that class counsel earned the fee they are requesting this Court to award.

## I. STATEMENT OF FACTS

National Healthcare, Inc. (hereinafter "NHC") is a publicly-held rural health care

---

1. On March 8, 1988, the Court entered a final judgment in this cause approving the terms of a proposed settlement stipulation submitted by the parties. The Court now deems it appropriate to award class counsel attorneys' fees and expenses.

2. One of the lawyers to testify stated that in his thirty years of practicing law he had been involved in complex shareholder litigation including class actions and derivative suits. In fact, he testified that he had participated in at least one case involving over $100,000,000.

management corporation. The company was begun in late 1981 by three of the named defendants: Steven L. Phelps (also the former Chairman, CEO, and President), Joseph D. Bohr, Jr. (a former Director and Chief Financial Officer), and William H. Cassels (a division Vice President). In its early years, NHC remained a relatively small company. As of December 31, 1984, the company had acquired nine hospitals. Each of those hospitals averaged fewer than fifty beds. By November 1985, the company had acquired several additional hospitals bringing its total to fifteen. At that time, NHC's plan was to continue purchasing small hospitals in rural communities and to then use what the company's leaders believed to be unique management techniques to turn such poorly-managed rural hospitals around in a very short time and into profitable facilities.

To finance the company's growth, NHC "went public" in November 1985 by issuing and selling to the public through a "firm commitment" underwriting 2,000,000 shares of its common stock. Through the exercise of an over-allotment option, the underwriters acquired from certain venture capitalist/selling warrantholders and sold an additional 300,000 shares of such stock. The initial offering price of such 2,300,000 shares of stock was $9.00 per share. In addition to the stock offering, NHC issued subordinated debentures having a principal amount of $30,000,000 and bearing interest at the rate of 14½% per annum.

NHC announced earnings for the first quarter of 1986 (for the quarter ended September 30, 1985) showing that the company had earned $.05 per share for the quarter, and by the end of December 1985, the stock price had risen to approximately $13.00 per share. On February 4, 1986, the company announced increased earnings for the second quarter of fiscal 1986 (for the quarter ended December 31, 1986) of $.09 per share, and the stock then rose to approximately $15.00 per share. From December 31, 1985, until April 1986, NHC acquired or signed letters of intent to purchase nine additional hospitals.

In April 1986, NHC followed its initial public offering with a second offering of 2,000,000 shares of common stock, this time at a price of $13.50 per share. Again, the initial allotment was sold and the underwriters exercised their over-allotment option to purchase from the selling warrantholders and sell an additional 300,000 shares. No new debentures were offered in this second public offering. Thus, a total of 4,600,000 shares was issued and sold in the two public offerings.

In each of the two public offerings, the defendant law firm of Wood, Lucksinger & Epstein served as securities counsel to NHC, and the defendant public accounting firm of Arthur Young & Company prepared the financial statements contained in the registration statements and prospectuses (with the exception of certain financial statements for individual hospitals prepared by other accounting firms before NHC's acquisition of such hospitals). Drexel Burnham Lambert, Inc.; Bear Stearns & Company, Inc.; and Robertson Coleman & Stephens served as lead underwriters of each of the two stock offerings and Drexel Burnham and Bear Stearns co-underwrote the November 1985 offering of debentures. Another 70–plus underwriters participated in the "underwriting syndicate" in each of the two public stock offerings. All of the remaining defendants are either officers, directors, selling warrantholders, or control persons (or affiliates thereof of NHC).

In mid–1986, NHC announced third-quarter earnings (for the period ending March 31, 1986) of $.22 per share. After that announcement, the company stock quickly rose to approximately $17.00 per share, but had declined to around $14.00 per share by the late summer of 1986. On September 18, 1986, NHC announced earnings for the fourth-quarter of fiscal 1986 of only $.02 per share. For the year, NHC announced earnings of $.38 per share, much less than the $.53 per share figure that had been publicly forecasted. Accordingly, the day of that announcement, the price of NHC common stock declined by approximately 42% to $7.50 per share. The price of the stock continued to fall and by December

31, 1986, it was trading at approximately $4.00 per share.

On January 9, 1987, NHC announced that it expected a $7,000,000 write-off for the second quarter of fiscal 1987 (the quarter ending December 31, 1986), but a profit nonetheless was predicted for the year. Immediately after that announcement, the stock price declined to approximately $3.50 per share.

The plaintiffs commenced this action on January 22, 1987, alleging, *inter alia,* that the disclosure documents distributed to potential investors in connection with the company's two public offerings of securities, subsequent reports to shareholders, and press releases, contained misrepresentations or omissions of material facts. The plaintiffs further alleged that the patients' accounts receivable entries on the company's financial statements were materially overstated and that the corresponding provisions for doubtful accounts and contractual allowances were materially understated, not only as a result of improper accounting procedures, but, as a result of deliberate fraud. The plaintiffs' complaint, and the subsequent amendments thereto, also contained allegations of other material misrepresentations or omissions of material financial and non-financial facts.

During February 1987, after the company issued another announcement stating that it expected a loss for the fiscal year 1987, as opposed to a profit as had been announced on January 9, 1987, the price of the stock declined to the $2.00 per share range. On September 3, 1987, NHC announced a substantial loss for the 1987 fiscal year and the replacement of several officers and directors. The stock price immediately fell to below $1.00 per share, where it remains.

All but three defendants have filed answers denying all material allegations of the complaint. The remaining three defendants—Arthur Young & Company; Wood, Lucksinger & Epstein; and DSA Financial Corp.—were added to the case only shortly before settlement. At the time the settlement was reached, Arthur Young & Company and Wood, Lucksinger & Epstein had filed still-pending motions to dismiss on numerous grounds, including the failure to state a claim against them upon which relief could be granted. DSA Financial Corp. had requested and received an extension of time by this Court in which to file an answer or responsive motion to the complaint.

Prior to the proposed settlement agreement, the parties engaged in substantial discovery, primarily in the nature of document review and interviews of potential witnesses. All of the named plaintiffs produced documents for the defendants.[3] Further, a heavy schedule of depositions had begun, with approximately eight days of testimony having been taken. In the fall of 1987, it became clear to the parties that there was a substantial possibility of reaching a global settlement in the case. The parties then, by agreement, reduced the amount of time devoted to further discovery in an effort to save all parties unnecessary expense, and this Court later entered a formal order staying all discovery during the ongoing settlement negotiations.

After much arm's-length and good-faith bargaining, all the parties were able to sign one global settlement stipulation and to present that settlement stipulation to this Court on December 30, 1987. Additionally, the parties submitted to this Court a motion for preliminary approval of the settlement, a proposed order certifying a plaintiff class for purposes of settlement and conditionally approving the settlement,[4]

---

**3.** At the early stage of this litigation, a document depository was established in a building next to the law firm of Capell, Howard, Knabe and Cobbs in Montgomery, Alabama. During the course of this litigation, well in excess of 1,000,000 pages of documents have been deposited in the depository.

**4.** The parties in this case proposed to the Court a settlement for a class before a class had been certified. Federal courts have permitted, though with great caution, the use of "settlement classes." *See Weinberger v. Kendrick,* 698 F.2d 61 (2d Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); *In re Beef Industry Antitrust Litigation,* 607 F.2d 167 (5th

proposed forms of notice to be mailed to the class, notice to be published in the *Wall Street Journal,* verified proof of claim and release form, and request for exclusion form.

On December 30, 1987, this Court entered an order granting the motion for preliminary approval of the settlement and, pursuant to the schedule included in the order, class counsel began mailing the approved notice to all persons who purchased common stock or debentures of NHC, at any time between November 5, 1985, through September 3, 1987, inclusive. On January 12, 1988, C & S Bank of Atlanta, Georgia, the transfer agent for NHC, mailed by first-class mail 1,450 notice packets to every holder of record of NHC stock at any time between November 5, 1985, and September 3, 1987, inclusive. Each such notice packet included the court-approved notice of class action certification and settlement and hearing, a copy of the settlement stipulation, a summary of the terms of the new preferred stock, a verified proof of claim and release form, a request for exclusion form, and a notice to certain brokers, etc. directing all nominee holders to forward the packet contents to any beneficial owners for whom such broker or nominee held NHC stock. On January 12, 1988, seventy-five additional packets were mailed to all beneficial owners during the class period of the debentures.

Of the 1,450 record holders during the class period identified by C & S Bank, one, Cede & Company, or its affiliate The Depository Trust Company ("DTC"), actually is a "street name" holder for other brokers, institutions, and clearing houses. Class counsel were able to obtain a list of DTC participants as of the end of the class period. Separate notice packets were mailed to all 1,110 of such participants. In addition, class counsel established a "telephone bank" and directly phoned all 1,100 of such DTC participants to remind them of the settlement and the court-established deadline. The response class counsel received from such DTC participants was very positive. When stock is held in "street name,"

the beneficial owner may elect to have his identity kept confidential. For such persons, class counsel had to rely to some extent on the "street name" holders to fulfill their duties to their clients and forward to them the appropriate information. Class counsel also had to rely on the notice published nationwide in the *Wall Street Journal.* Class counsel did obtain a "NOBO," Non–Objecting Beneficial Owner, list of persons whose stock was held in "street name" by a DTC participant, but who did not request that their names be kept confidential. Class counsel mailed 1,483 packets to such non-objecting beneficial owners between February 21 and 25, 1988.

In response to requests for packets from brokers and/or individuals, class counsel have mailed more than 5,800 additional notice packets to potential class members. Although over 10,000 packets have been mailed, the class in this case is not in actuality that large. The use of so many stockholder lists necessarily results in a great deal of duplication. Additional duplication is created because many of the brokers maintain their records on a transaction basis. As a result, a shareholder may receive one packet as a record holder, one packet as a non objecting beneficial owner, and one packet from his broker for each purchase or sale transaction. This Court is of the opinion that although such duplication does carry some economic costs, class counsel are to be commended for their good-faith effort to notify every single class member.

In addition to the foregoing, notice was published nationwide in the January 19, 1988, edition of the *Wall Street Journal.* The former Fifth Circuit Court of Appeals has made it clear that Rule 23(e) of the *Federal Rules of Civil Procedure* mandates individual notice only to those potential class members who can reasonably be ascertained. *In re Beef Industry Antitrust Litigation,* 607 F.2d at 178–79; *see also Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (finding class notice sufficient even

Cir.1979), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981).

though only 2,500,000 or 41.7% of a 6,000,-000–member class were identified); *In re Nissan Motor Corp. Antitrust Litigation,* 552 F.2d 1088, 1099 (5th Cir.1977) ("Obviously, the word 'reasonable' cannot be ignored [in Rule 23(c) ]. In every case, reasonableness is a function of anticipated results, costs, and amount involved. A burdensome search through records that may prove not to contain any of the information sought clearly should not be required. On the other hand, a search, even though calculated to reveal partial information or identification, may be omitted only if its costs will exceed the anticipated benefit."). This Court is of the opinion that the notice given to members of the plaintiff class by publication and by mail, as aforesaid, complied with all requirements of due process, all requirements of Rule 23 of the *Federal Rules of Civil Procedure,* and constituted the best notice practicable under the circumstances. This Court is further of the opinion that any additional expense in locating and notifying any class members who may not have received notice would be outweighed by the tremendous expense of doing so, and which expense would materially reduce the fund available for all class members.

Prior to the February 8, 1988, cutoff established by the Court for the filing of requests for exclusion, sixteen such requests were filed with the Court. Twelve additional requests for exclusion have been filed with the Court since that cutoff date. With leave of the Court, class counsel have in good faith attempted to contact each of the persons requesting exclusion, and all of the persons requesting exclusion class counsel have been able to contact did so only by mistake due to the similarity of that form and the proof of claim form. Of the remaining persons requesting exclusion, several did not suffer a loss on their purchase of NHC stock and still others purchased their stock outside the class period and are not class members. Four objections and no notices of appearance were filed with the Clerk of the Court by the deadline for filing such matters.

As of February 29, 1988, 1,139 claim forms had been returned to the Clerk of this Court representing a class-wide loss among the purchasers of the stock (rather than the debentures) of NHC in excess of $4,000,000.

## II. DISCUSSION

According to the now axiomatic American Rule, recently reaffirmed by the United States Supreme Court in *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), all parties are to bear their own costs in litigation. One of the recognized exceptions to the American Rule is the "common fund" case. Under the "common fund" exception:

> [a] person who maintains a lawsuit resulting in the creation, preservation or increase of a fund in which others have a common interest may be reimbursed .from that fund for attorneys' fees and costs incurred. This avoids the unjust enrichment of those who would otherwise benefit from the fund without paying the litigation costs necessary to produce the fund. An attorney in a class action creating a common fund is entitled to compensation for his services from the fund created for the class but the amount is subject to court approval.

*Fickinger v. C.I. Planning Corp.,* [1987 Transfer Binder] *Fed.Sec.L.Rep.* (CCH) ¶ 93,126, at 95,547, 646 F.Supp. 622 (E.D. Pa.1986). *See, Blum v. Stenson,* 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 1550 n. 16, 79 L.Ed.2d 891 (1984); *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980).

Historically, the rationale entitling counsel to a percentage of the common fund derives from the equitable power of the Courts under the doctrines of *quantum meruit, Central R.R. & Banking Co. v. Pettus,* 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885); unjust enrichment, *see, e.g., Trustees v. Greenough,* 105 U.S. (15 Otto) 527, 26 L.Ed. 1157 (1882); and later, what has become known as the "substantial" or "common benefit" doctrine. Under this rule,

... fee reimbursement is permitted (1) when litigation confers substantial monetary or nonmonetary benefits on members of an ascertainable class, and (2) when the court's jurisdiction over the subject matter of the suit, and over a named ... collective representative of the class, makes possible an award that will operate to spread the costs proportionately among class members.

H. Newberg, *Attorney Fee Awards* § 2.01 at 28 (1986). *See, also, Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

More recently, courts also have acknowledged the economic reality that in order to encourage "private attorney general" class actions brought to enforce the securities laws on behalf of persons with small individual losses, a financial incentive is necessary to entice capable attorneys, who otherwise could be paid regularly by hourly-rate clients, to devote their time to complex, time-consuming cases for which they may never be paid. *See J.I. Case Co. v. Borak,* 377 U.S. 426, 432, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964); *Dolgow v. Anderson,* 43 F.R.D. 472 (483–484) (E.D.N.Y.1968). As stated in *Deposit Guaranty National Bank v. Roper,* 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980),

> ... [T]he financial incentive that class actions offer to the legal profession is a natural outgrowth of the increasing reliance on the "private attorney general" for the vindication of legal rights; obviously this development has been facilitated by Rule 23.... Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, persons may be without any effective redress unless they employ the class action device.

*Id.* at 338–339, 100 S.Ct. at 1174.

Judge Sofaer of the United States District Court for the Southern District of New York recently explained the reasons for providing a financial incentive to capable counsel in securities class actions in an unpublished opinion in which he awarded a fee of $4.3 million, equivalent to 25% of a recovery valued at $20,000,000. At the fee hearing in that case Judge Sofaer held:

> It unquestionably is true that without able lawyers handling these matters not only do some of them go unprosecuted, but the big difference in my experience is in the amount obtained and you don't get the highest recovery when you are paying at the low end of the scale of fee recovery in contingent actions. It seems to me that I as the protector of the class can fairly say, and honestly say, that I believe it is in the class's best interest—of this class and of the future classes yet unknown—to pay this kind of money for these kinds of benefits.

*In re Pepsico Securities Litigation,* Civil Action No. 82–CIV–8403 (S.D.N.Y. April 26, 1985) (transcript of April 26, 1985, at pages 17–18). Cited in H. Newberg, *Attorney Fee Awards,* § 1.05 at p. 6.

Class counsel herein contend that in accordance with the well-established common fund exception to the American Rule, they are entitled to an award of their fees and expenses out of the fund that has been created for the class by their efforts.

## A. THE APPROPRIATE METHOD OF CALCULATING A COMMON FUND FEE AWARD.

During the 1970's, a debate was triggered primarily in the Second and Third Circuits over the appropriate method of calculation of a common fund fee award. This controversy still affects how attorneys' fees are awarded. Thus, a look back at both the history of the common fund fee doctrine and the more recent instructions regarding its use and calculation by the United States Supreme Court and commentators will prove instructive.

### 1. *The Historical Method of Computing A Common Fund Fee Award.*

The first United States Supreme Court case recognizing that attorneys had a claim to fees payable out of a common fund which had been created through their efforts was *Central R.R. & Banking Co. v. Pettus,* 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885). In *Pettus,* a fee was awarded

based upon a percentage of the fund recovered for the class. Because class counsel in that case had an agreement with the named plaintiffs limiting the percentage of their fee, the court used that fee agreement as a guideline to determine a "reasonable percentage based fee." *Id.* at 128, 5 S.Ct. at 393.

From the time of the *Pettus* decision in 1885 until 1973, fee awards granted pursuant to the common fund exception were computed as a percentage of the fund, with the amount of the fee left to the court's discretion, the only standard being reasonableness under the circumstances of a particular case. *See, e.g.,* H. Newberg, *Attorney Fee Awards,* § 2.02, at 31 (1986); *Court Awarded Attorney Fees,* Report of the Third Circuit Task Force, October 8, 1985 (Arthur R. Miller, Reporter), 108 F.R. D. 237, 242 (1985) (the "Task Force Report").

### 2. The Lindy Lodestar and Johnson 12–Factor Approaches.

In an effort to provide findings on fee awards that could be more easily reviewed by the courts of appeal, and insure that attorneys be compensated for the reasonable value their time would normally command in the marketplace, the Third Circuit in 1973 set out a prescribed set of guidelines that trial courts in that circuit would be required to consider in arriving at a reasonable fee award under the common fund doctrine. In *Lindy Brothers, Inc., of Philadelphia v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3rd Cir.1973) ("Lindy I"), *appeal following remand,* 540 F.2d 102 (3rd Cir.1976) ("Lindy II"), the Third Circuit reviewed a trial

court's order approving attorneys' fees out of a common fund which was created by the settlement of several class actions charging a conspiracy to fix prices in violation of the Sherman Act. The Third Circuit in *Lindy* vacated the trial court's fee award and set forth new fee award guidelines and prescribed steps, which now are known commonly as the "lodestar" approach.

Under the Third Circuit's lodestar approach, the district court must first multiply the number of hours it deems reasonably to have been spent by the plaintiffs' counsel times an hourly rate the Court determines to be reasonable for similarly complex non-contingent work, to arrive at a lodestar figure. That lodestar figure may then be adjusted up or down for certain factors known as multipliers, such as contingency and the quality of the work performed, to arrive at a final fee.

At approximately the same time as the *Lindy* decision was rendered, the United States Court of Appeals for the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974), adopted a 12–factor method of determining court-awarded attorney fees.[5] Although *Johnson* was not a common fund case, but a statutory fee award pursuant to 42 U.S.C. § 1988, it has been applied outside the realm of statutory fees. *See, e.g., Hoffert v. General Motors Corp.,* 656 F.2d 161 (5th Cir.1981) (Unit A), *cert. denied,* 456 U.S. 961, 102 S.Ct. 2037, 72 L.Ed.2d 485 (1982) (product liability claim); *Copper Liquor, Inc. v. Adolph Coors Co.,* 684 F.2d 1087 (5th Cir.1982), *modified on other grounds,* 701 F.2d 542 (5th Cir.1983) (en

---

**5.** The 12 factors are:
(1) the time and labor required;
(2) the novelty and difficulty of the questions involved;
(3) the skill requisite to perform the legal service properly;
(4) the preclusion of other employment by the attorney due to acceptance of the case;
(5) the customary fee;
(6) whether the fee is fixed or contingent;
(7) time limitations imposed by the client or the circumstances;
(8) the amount involved and the results obtained;

(9) the experience, reputation, and ability of the attorneys;
(10) the "undesirability" of the case;
(11) the nature and the length of the professional relationship with the client;
(12) awards in similar cases.
*Id.* 717–719. These factors were reflected in the American Bar Association Code of Professional Responsibility, Disciplinary Rule 2–106 (1980), and are currently reflected in Model Rules of Professional Conduct Rule 1.5(a).

banc ), overruled *Int'l Woodworkers of America AFL–CIO and its Local 5–376 v. Champion Int'l Corp.* 790 F.2d 1174 (5th Cir.1986), affirmed sub nom, *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* — U.S. —, 107 S.Ct. 2494, 96 L.Ed.2d 385.

The Task Force Report noted that "[m]ost commentators consider *Johnson* to be little different from *Lindy* because the first criterion of the *Johnson* test, and indeed the one most heavily weighted, is the time and labor required. Similarly, many of the *Johnson* factors are subsumed within the initial calculation of hours reasonably expended at a customary hourly rate." Task Force Report, 108 F.R.D. at 244. Recently in light of five United States Supreme Court statutory fee award decisions [6] in which the *Johnson* factors were presumptively included into the lodestar calculation, the Eleventh Circuit has refined its analysis for determining statutory fee awards. *Norman v. Housing Authority of City of Montgomery,* 836 F.2d 1292 (11th Cir.1988). In *Norman,* Judge Owen Forrester writing for the Eleventh Circuit noted the lodestar approach has been favored "because it produces a more objective estimate and ought to be a better assurance of more even results." *Id.* at 1299.

3. *In the Context of Common Fund Fee Awards The Supreme Court Has Endorsed the "Percentage of the Fund" Approach.*

Regardless of the approaches begun in some of the circuit courts in the 1970's, the United States Supreme Court has never formally adopted or authorized the *Lindy* lodestar in the context of a common fund fee award even though recently provided the opportunity to do so in *Boeing Company v. Van Gemert,* 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). Indeed, every Supreme Court case addressing the computation of a common fund fee award has determined such fees on a percentage of

the fund bases. *See, e.g., Trustees v. Greenough,* 105 U.S. (15 Otto) 527, 532, 26 L.Ed. 1157 (1881); *Central R.R. & Banking Co. v. Pettus,* 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885); *Sprague v. Ticonic National Bank,* 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939).

In recognition of the differences between fund and statutory fee cases, Justice Powell explained that:

> Unlike the calculation of attorney's fees under the "common fund doctrine" where a reasonable fee is based on a fair percentage of the fund bestowed on the class, a reasonable fee under § 1988 reflects the amount of attorney time reasonably expended on the litigation.

*Blum,* 465 U.S. 886, 900 n. 16, 104 S.Ct. at 1550 n. 16 (1984).

The Supreme Court's declaration in *Blum* is not surprising in light of the vehement criticism commentators and lawmakers have leveled against the lodestar and 12–factor methods in common fund cases, and more particularly, against such fee computation methods' emphasis on the number of hours expended. For example, Professor Hornstein wrote in his article "Legal Therapeutics: The 'Salvage' Factor in Counsel Fee Awards," 69 *Harv.L.Rev.* 658 (1956):

> Where success is a condition precedent to compensation, "hours of time expended" is a nebulous, highly variable standard, of limited significance. One thousand plodding hours may be far less productive than one imaginative, brilliant hour. A surgeon who skillfully performs an appendectomy in seven minutes is entitled to no smaller fee than one who takes an hour; many a patient would think he is entitled to more.

*Id.* at 660. Professor Hornstein's article was cited with approval by the Supreme Court in *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 394 n. 18, 90 S.Ct. 616, 626 n. 18, 24 L.Ed.2d 593 (1970).

6. *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Blum v. Stenson,* 465 U.S. 886 (1984); *Riverside v. Rivera,* 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986); *Pennsylvania v. Delaware Valley Citizens Coun-* cil, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986); *Pennsylvania v. Delaware Valley Citizens Council,* — U.S. —, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987).

Similarly, a study prepared by Professor Arthur Miller, *Attorneys' Fees in Class Actions* (Federal Judicial Center 1980), as well as an article by Professor Coffee, "Rescuing the Private Attorney General: Why the Model of the Lawyer as Bounty Hunter is Not Working," 42 *Md.L.Rev.* 215 (1983), have criticized the *Lindy* and *Johnson* approaches because their undue emphasis on the number of hours logged provides a disincentive to early settlement. *In Blank v. Talley Industries,* 390 F.Supp. 1, 5 (S.D.N.Y.1975), Judge Weinfeld stated:

> To give [the number of hours spent] prime importance may at times result in rewarding inefficiency or the luxurious practice of law and penalizing those who are efficient and expeditious in performing their legal tasks.

*See, also, Dorfman v. First Boston Corp.* 70 F.R.D. 366, 375 (E.D.Pa.1976); *Arenson v. Board of Trade of the City of Chicago,* 372 F.Supp. 1349, 1356 (N.D.Ill.1974).

More recently, Professor Coffee has persuasively argued that a percentage of the gross recovery is the only sensible method of awarding fees in common fund cases:

> If one wishes to economize on the judicial time that is today invested in monitoring class and derivative litigation, the highest priority should be given to those reforms that restrict collusion and are essentially self-policing. The percentage of the recovery fee award formula is such a "deregulatory" reform because it relies on incentives rather than costly monitoring. Ultimately, this "deregulatory" approach is the only alternative to converting the courts into the equivalent of public utility commissions that oversee the plaintiffs' attorney and elaborately fix the attorney's "fair" return.

Coffee, "Understanding the Plaintiffs' Attorney: The Implications of Economic Theory for Private Enforcement of the Law Through Class and Derivative Actions," 86 *Colum.L.Rev.* 669, 724–725 (1986).

Perhaps the most significant criticism of the *Lindy* and *Johnson* approaches may be found in the Third Circuit Task Force Report, 108 F.R.D. 237 (1985). Considering the great distinctions between the policies and rationale supporting common fund fee awards versus statutory fee awards; distinctions acknowledged in footnote 16 of *Blum;* and, recognizing that the lodestar approach may have been applied improperly to common fund cases, the Third Circuit commissioned a task force headed by Professor Arthur Miller to study the problems of court-awarded attorneys' fees and to develop recommendations that would accomplish the following:

> "Provide fair and reasonable compensation for attorneys in those matters in which fee awards are provided by federal statute or by the fund-in-court doctrine; to discourage abuses and delays in the fee setting process; to encourage early settlement or determination of cases; to provide predictability; to carry out the purposes underlying court-awarded compensation; to simplify the process by reducing the burdens it currently imposes on the courts and on litigants; and to arrive at fee awards that are fair and equitable to the parties and to take into account the economic realities of the practice of law."

Task Force Report, 108 F.R.D. at 238.

The Task Force found that the *Lindy* lodestar approach, or for that matter any method premised upon the number of hours expended, failed to achieve any of these stated goals in common fund cases in which the measure of the recovery is the best determinant of the reasonableness and quality of the time expended. Instead, the Task Force recommended that all fee awards in common fund cases be awarded as a percentage of the fund. Further, the Task Force recommended that the percentage to be awarded should be negotiated early on in the litigation so that the attorneys could devote their full time to attempting to increase the fund for the class, which in turn increases their own fee. The Third Circuit Task Force was recently favorably cited by the Supreme Court in *Evans v. Jeff D.,* 475 U.S. 717, 736, 106 S.Ct. 1531, 1542 n. 28, 89 L.Ed.2d 747 (1986).

As the Third Circuit Task Force explained, a key element of the fund case is that fees are not assessed against the un-

successful litigant (fee shifting), but rather are taken from the fund or damage recovery (fee spreading).... Task Force Report, 108 F.R.D. at 250. Furthermore, in contrast to the calculation of a statutory fee, "payable by the defendant depending on the extent of success achieved, the common fund in itself is the measure of success.... (and) represents the benchmark on which a reasonable fee will be awarded." H. Newberg, *Attorney Fee Awards,* § 2.07 at 417. Consequently, the analysis in a common fund case focuses, not on the plaintiff's position as "prevailing party," but on a showing that the fund conferring a benefit on the class resulted from their efforts. *Id.* at 40. In this context, monetary results achieved predominates all other criteria. *Id.* at 41.

### 4. *Lower Courts Have Adopted the "Percentage of the Fund" Approach.*

Since the Supreme Court's decision in *Blum* that common fund fee awards are to be computed as a fair percentage of the fund, courts increasingly have begun to shy away from the *Lindy* and *Johnson* approaches and have returned to the percentage of the fund method. For example, the United States Court of Appeals for the District of Columbia recently followed the Supreme Court's directive regarding the appropriate method of awarding fees in common fund cases:

> Where the fees, as here, will come out of a "common fund," "a reasonable fee is based on a percentage of the fund bestowed on the class." *Blum,* 465 U.S. at 900, n. 16, 104 S.Ct. at 1549, n. 16.

*Bebchick v. Washington Metro. Area Transit,* 805 F.2d 396, 406 (D.C.Cir.1986).

In *Edmonds v. U.S.,* 658 F.Supp. 1126, 1144 (D.S.C.1987), the district court, like the D.C. Circuit, held that *Blum* indicated that a "percentage of the fund analysis" is the preferred method of calculating a fee. However, in an abundance of caution, the Court applied a lodestar analysis noting that there are no recent holdings which make the matter completely free from doubt and to demonstrate that the fee was

reasonable under either approach. *Id.* at 1143.

Similarly, in *Phemister v. Harcourt Brace Jovanovich, Inc.,* 1984–2 Trade Cas. (CCH) ¶ 66,234 (N.D.Ill.1984), the district court observed:

> Thus, the court [in *Blum* ] clearly recognized the propriety of using the percentage of recovery method in a common fund case. Numerous courts have found this simple percentage method appropriate. See *Miller v. Woodmoor,* 1979 CCH Federal Reporter ¶ 96,853 (D.Colo.1978) 470–95, 471; *Philadelphia Electric Co. v. Anaconda American Brass Co.* [1969 Trade Cas. ¶ 72,892], 47 F.R.D. 557, 560 (E.D.N.Y.1969); *Bottger v. King Resources Co.,* 420 F.Supp. 610, 630–31 (D.Colo.1976).

*Id.* at 66,995.

In *Howes v. Atkins,* 668 F.Supp. 1021 (E.D.Ky.1987), a shareholders' derivative action in which a 40% fee was awarded, the court observed:

> Recent decisions make it clear that a lodestar analysis is usually inappropriate in cases of this kind and indeed in most common fund cases. There has been a clear trend away from the lodestar approach and back to a percentage award in common fund cases.

*See, also, Basile v. Merrill Lynch Pierce Fenner & Smith,* 640 F.Supp. 697 (S.D. Ohio 1986) (application of percentage of recovery method in common fund case such that value of common fund is first factor to consider); *In re Iomega Securities Litigation,* [1987 Transfer Binder] *Fed.Sec.L. Rep.* (CCH) ¶ 93,542 (D.Conn.1987) [Available on WESTLAW, 1987 WL 43391] (awarded 22% fee in reliance on *Blum* ).

Some courts have used the lodestar as the starting point in order to substantiate a percentage of the fund award. For example, applying a lodestar with a multiplier of two, the Court in *Eltman v. Grandma Lee's, Inc.,* [1986–1987 Transfer Binder] *Fed.Sec.L.Rep.* (CCH) ¶ 92,798 (E.D.N.Y. 1986), awarded $990,000 in fees and $32,063.96 in expenses. The Court then considered the award in relation to the size of the settlement and concluded that a fee of

slightly less than 30% of a $3,000,000 fund fell reasonably within the range of 20% to 50% awarded in similar cases. *See, also, In re Warner Communications Securities Litigation,* 618 F.Supp. 735, 749 (S.D.N.Y. 1985), *aff'd,* 798 F.2d 35 (2d Cir.1986) (a 25% fee award, or $4.385 million out of $18.6 million fund, citing *Blum* ); *Green v. Emersons, Ltd.,* Fed.Sec.L.Rep. (CCH) ¶ 93,263 (S.D.N.Y.1987), [Available on WESTLAW, 1987 WL 11558] (42.6% of the fund awarded); *Friedlander v. Barnes,* [1986–1987 Transfer Binder] *Fed.Sec.L. Rep.* (CCH) ¶ 92,754 (S.D.N.Y.1986) [Available on WESTLAW, 1986 WL 5517] (30% fee out of a $1,025,000 settlement).

## B. DETERMINATION OF THE APPRO-PRIATE PERCENTAGE OF A COMMON FUND TO BE AWARDED AS A FEE.

There is no general rule of what percentage of a common fund may reasonably be awarded as a fee because the amount of any fee must be determined upon the facts of each case. As Justice Frankfurter observed, "Individualization in the exercise of a discretionary power [for fee awards] will alone retain equity as a living system and save it from sterility." *Sprague v. Ticonic National Bank,* 307 U.S. 161, 167, 59 S.Ct. 777, 780, 83 L.Ed.2d 1184 (1939). Thus, a review of the cases awarding attorney fees pursuant to the common fund doctrine gives this Court some general guidance.

The majority of common fund fee awards fall between 20% to 30% of the fund. *See, e.g.,* H. Newberg, *Attorney Fee Awards,* § 2.07, at 51 (1986). *See, also, In re Ampicillin Antitrust Litigation,* 81 F.R.D. 395, 404 (D.D.C.1978); *Rosenfeld v. Black,* 56 F.R.D. 604, 605 (S.D.N.Y.1972); the Third Circuit Task Force found that "[j]udges systematically awarded fees in the range of twenty to twenty-five percent of the fund...." Task Force Report, 108 F.R.D. at 247 n. 32 (1985).

To avoid depleting the funds available for distribution to the class an upper limit of 50% of the fund may be stated as a general rule, although even larger percentages have been awarded in some cases.

*See, e.g., Zinman v. Avemko Corp.,* [1978 Transfer Binder] *Fed.Sec.L.Rep.* (CCH) ¶ 96,325 (E.D.Pa.1978) ($130,000 fee awarded pursuant to *Lindy* analysis; 50% of cash settlement); *Borak v. J.I. Case, Co.,* 56 Civ. 247 (W.D.Wis.1970) (securities case; $198,000 fee awarded; 56.6% of class recovery).

In an effort to provide appellate courts a record for review of attorney fee awards, courts now are beginning to view the median of this 20% to 30% range, i.e., 25%, instead of a lodestar hourly fee as in statutory fee awards, as a "bench mark" percentage fee award which may be adjusted in accordance with the individual circumstances of each case. *See, Meshel v. Nutri/System, Inc.,* 102 F.R.D. 135, 140 (E.D. Pa.1984) (A *Lindy*-based case using a 25% fee standard to avoid awarding inefficiency); H. Newberg, *Attorney Fee Awards,* § 2.08, at 51–52 (1986). "To avoid the problems and criticisms of a common fund fee award being summarily granted as a percentage of the fund recovered without any findings supporting its reasonableness ... courts are now supporting their percentage awards with particular findings showing factors considered." H. Newberg, *Attorney Fee Awards,* § 2.07 at 47.

■ Some of the factors which have impact on the appropriate percentage fee to be awarded in the instant case are the results achieved, the short time in which the settlement was reached, the lack of substantial objections by class members and other parties to either the settlement terms or to the fee requested by class counsel, the non-monetary benefits conferred upon the class by the settlement, the economies of scale involved in prosecuting a class action, the contingent nature of the fees, the fact that the settlement was structured in such a way as to assist NHC in overcoming its financial troubles to the benefit of all concerned, the complexity and novelty of certain of the claims and issues involved, and the fact that although the settlement fund amounts to $17,425,000, the requested fee will be paid solely from the $9,925,000 cash portion of the settle-

ment. These factors will now be discussed by the Court individually.

### 1. *The Results Achieved.*

■ The critical element in determining the appropriate fee to be awarded class counsel out of a common fund is the result obtained for the class through the efforts of such counsel. In the instant case, this Court has approved a settlement wherein class counsel created a cash fund for the plaintiff class members of $9,925,000 and also a fund consisting of a new issue of 25% participating cumulative convertible preferred stock of NHC having an aggregate liquidation preference of $7,500,000, or $25.00 per share. This new issue of preferred stock is convertible into common stock at the holder's election at a ratio of five shares of common stock for every one share of the new preferred stock. Further, based upon the latest balance sheets issued by NHC, the company has net worth available to holders of the new preferred stock in the event of liquidation greatly in excess of the $7,500,000 liquidation preference of the new preferred stock, a fact which demonstrates the new preferred stock has a real value.

Because of the conversion feature of the preferred stock, should NHC begin to prosper after this lawsuit is concluded or as a result of the new management brought into the company or for any other reason, the "up side" value to the preferred stock is unlimited. If, on the other hand, the company does not survive, the class members will now have a preference upon liquidation.

### 2. *The Time in Which the Result was Achieved.*

All of the benefits the settlement confers upon the class as described above, and as more particularly described in this Court's companion memorandum opinion approving the settlement, are magnified by the fact that class counsel were able to achieve these results in a very short period of time. From the time the complaint was filed in this lawsuit until the time notice of the proposed settlement was mailed to all class members, less than one year had passed.

Had the case not been settled at this early stage, it is this Court's opinion that it would have been *at least* another year until trial. During that year, the expenses incurred by class counsel would have multiplied by several times due to the increased need for the taking of a substantial number of depositions, perhaps numbering as many as a hundred or more, and the need to hire numerous expert witnesses on several issues including accounting issues, class-wide damages, and expert testimony regarding the professional duties and responsibilities of attorneys. Even if class counsel had prosecuted this case until its ultimate end in this court, it is likely that they would not have achieved any result for the class for several years, and, even then, the final result may not have been as favorable to the class as the settlement heretofore approved by this Court.

### 3. *The Settlement was Structured in Such a Way as To Avoid Bankruptcy of NHC.*

From the outset of this litigation, this Court has expressed on several occasions its concern that the expenses of this litigation would force NHC, which obviously has had its financial struggles, into bankruptcy. A substantial number of the class members still own stock in NHC and it would not be to their benefit or to the benefit of any of the litigants or the public for the company to bankrupt. The settlement in this case provides that NHC does not pay any portion of the $9,925,000 cash portion of the settlement but instead issues a new convertible preferred stock having a liquidation preference of $7,500,000.

The new issue of preferred stock by NHC not only allows the company to begin to shift its resources to better management rather than to better litigation techniques; its conversion feature provides an unlimited "up side" to the new stock's value while at the time providing a "down side" protection of a $25.00 per share liquidation preference.

#### 4. The Non–Monetary Benefits Conferred Upon the Class by the Settlement.

As hereinabove discussed, the settlement stipulation in this case and the events leading up to the settlement stipulation have conferred benefits upon the class in addition to the settlement fund consisting of cash and new stock. Benefits, such as the change in management of the corporation and the voting trust, do not create a fund from which fees may be paid to class counsel. Nonetheless, the fact that such additional benefits were achieved for the class is a factor which should be considered in determining what appropriate percentage fee should be awarded out of the settlement fund. *See Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

The Settlement Stipulation has required NHC to rid itself of related party transactions to the extent that it was in the interest of the company to do so; the settlement has required the former Chairman of the Board of Directors, President, and Chief Executive Officer Steven Phelps, and also the former Chief Financial Officer and Director Joe Bohr to place all their shares of NHC common stock into a voting trust to be voted by the new management of the company and also not to seek or accept nomination either to the company's Board of Directors or as an officer of the company for a period which should allow the new management time to try to put the company back on a sound financial footing.

Before agreeing to discuss any form of settlement which would include an issue of new securities to the class members, class counsel required that the company take steps, including the replacement of Phelps and Bohr, to improve its management. In response to that demand, NHC, among other things, brought in James McAfee, formerly second in command of the highly respected Charter Medical Corporation, as the new Chairman of the Board and President of the company. The company has made other management shifts and changes designed to streamline and improve the overall efficiency of the company.

The steps instituted in part by class counsel prevented, or at least delayed for a sufficient time to allow new management to make a go of the company, the eminent possibility of bankruptcy. Moreover, by achieving all of these results within one year of filing the lawsuit, class counsel have avoided a dispute which surely could have lasted in this court for years and a trial which would have lasted for at least several months. Given the likelihood of subsequent appeals after a trial, this case could have remained in litigation for many years. During that time, the plaintiffs' expenses, which already are considerable, would have multiplied many times over thereby depleting the plaintiffs' future recovery, if any. Further, some portion of the $9,925,000 cash portion of the settlement was contributed by NHC's insurance carrier pursuant to its directors and officers ("D & O") insurance policy. The D & O carrier has voiced a substantial defense to the claim that the nature of the allegations made by the plaintiffs prevent coverage. In addition, the D & O policy, which has a maximum limit of $10,000,000, includes the payment of attorneys' fees and expenses for covered defendants, and the longer this litigation were to last, the less monies from that D & O policy would be available to pay to the plaintiff class.

For the reasons which this Court has previously outlined in a companion memorandum opinion approving the final settlement in this case, this Court is of the opinion that the settlement is a good one for all concerned. It is likely that the class members who have filed claims will receive a good return on their losses after payment from the fund of all expenses and attorneys' fees. Regardless of the actual percentage return realized by the class, the class members will probably receive returns of at least a substantial portion of their losses within approximately one year from the time of filing suit, new management from a respected health care company will have been brought in, and the company will have been saved from the immediate possibility of bankruptcy, at least for

a time sufficient to give the new management a chance to turn the company around to the benefit of the class members and the public.

### 5. *The Lack of Substantial Objections to the Settlement and to the Requested Fee.*

■ The pole star in determining the reasonableness of any fee award pursuant to the common fund doctrine should be whether the class members themselves believe the fee to be reasonable. Over 9,000 notices of the proposed settlement, including the amount of the fee to be requested by class counsel, have been mailed to putative class members. [Although many class members received one or more duplicate notices, it is nonetheless apparent to this Court that the class numbers in the thousands.] The notice sent to class members specifically noted the class member's right to object for any reason to the fee request. Out of the more than 9,000 notices that have been mailed, only two class members have filed objections to the requested attorneys' fee.[7]

In his objection, Dr. Cosby states that he did not receive an itemization of class counsel's time. Class counsel have subsequently supplied Dr. Cosby with a copy of their fee petition, memorandum, and the supporting affidavits and exhibits. This Court is of the opinion that Dr. Cosby states no legitimate reason for a reduction of class counsel's fee; he simply states that class counsel should receive the lesser including expenses of $150,000 for every full man year of time expended or $70.00 per hour. This Court is of the opinion that Dr. Cosby's suggestions are unreasonable and without merit. Had Dr. Cosby hired his own lawyer and filed his own lawsuit, even if he were fortunate enough to recover his loss and the hundreds of thousands of dollars of expenses he would personally have incurred, his attorney's fee likely would have been in the range of ⅓ to 40%.

The Court has also reviewed the objection filed by Professor Hill. Similarly, he provides no legitimate reason for reducing class counsels' fee except that the "little guy" deserves a break. This Court is of the opinion that were it not for the splendid job done by class counsel herein, Professor Hill and all the other "little guy" class members would have lost all of their investment. Instead, class counsel have achieved for Professor Hill and the other class members a settlement which will yield them a good recovery even after payment of the requested fee and expenses. Accordingly, this Court is of the opinion that Professor Hill's objection is unreasonable and without merit.

### 6. *The Economies of Scale Involved in Prosecuting a Class Action.*

In the past, some courts have lowered fees to attorneys who achieved a quick result in a class action due to the economies of scale inherent in any class action, and due to the very nature of the lodestar and *Johnson* approaches. Some also have reasoned that there is little additional time or effort required to litigate a class action; accordingly, the plaintiffs' attorney should not be allowed to receive a contingent fee payable out of the entire fund at the same rate that he would receive a fee payable from one claim.

■ Because the normal 20% to 30% range of fee percentages awarded in securities common fund cases already reflects this economy of scale, there is no need for downward adjustment of any fee request which falls within the normal 20% to 30% range simply because little time was expended on the case. One of the reasons for supporting a percentage fee award is to encourage early settlement of cases. *See* H. Newberg, *Attorney Fee Awards*, § 2.07 at 48–51. (*Cf.*, the level of contingent fee generally established in the marketplace for legal services is approximately ⅓ of the recovery for traditional commercial or personal injury claims.) *Id.* at 49.

---

**7.** The first objection was filed in this Court on February 11, 1988, by Dr. Robert M. Cosby of Birmingham, Alabama. The second objection was filed on February 17, 1988, by Professor

Steven P. Hill of Urbana, Illinois. No one appearing at the hearing the Court conducted on the approval of the final settlement objected to the request for attorneys' fees and expenses.

As is discussed in the Third's Circuit Task Force Report, an award of fees based on an hourly or lodestar rate only encourages plaintiffs' attorneys to prolong litigation in order to "milk" as much of a fee as possible out of a case. Allowing a percentage fee award allows the attorneys involved to concentrate their efforts solely on achieving a high rate of return for their clients and the class, which in turn raises counsel's own fee, instead of devoting their efforts to putting enough hours into the case to generate a sizable fee without concern for the best interests of the class members.

In the instant case, the requested fee (which is in fact below the thumb-rule range of 20% to 30%) already has taken into consideration the fact that due to the economies of scale inherent in a class action, the percentage fee awarded should be less than that awarded in personal injury or commercial contingent fee cases.

### 7. *Payment of the Attorneys' Fees out of the $9,925,000 Cash Portion of the Settlement.*

Class counsel have made no pretense to this Court concerning the fact that they request their fee be paid in cash out of the $9,925,000 cash portion of the settlement and that they do not receive as a fee any portion of the new issue of preferred stock. Defendants' counsel have represented that they will adamantly oppose an award of stock to class counsel because NHC does not want them as stockholders. Although the requested fee amounts to 19.5% of the aggregate $17,425,000 fund, the fee request equals just under ⅓ of the cash portion of the settlement. It is for this reason that class counsel have requested a fee that is below the 20% to 30% normal range of common fund percentage fee awards.

In cases in which a fund is created for a class consisting of both cash and securities, the issue arises whether the attorneys' fee should be awarded solely out of the cash or should consist of a mix of cash and securities. "When the fund consists of property or property plus cash, a judge can award the fees wholly in cash...." 5C Jacobs, *Litigation and Practice Under Rule 10b–5*, § 302.03[b], at 12–222 (2d Ed.1987 Revision). For example, in *Bleznak v. C.G.S. Scientific Corp.*, 387 F.Supp. 1184, 1191 (E.D.Pa.1974), a settlement fund similar to the one in the instant case was achieved, and the court approved a fee paid solely out of the cash portion of the fund. In the circumstances herein, class counsel request this Court to order that their fee be paid solely out of the cash portion of the settlement and they believe that the circumstances of this case and applicable case law justify that result.

Another distinction between issuing new stock to the class members in settlement of their case as opposed to giving such new stock to the attorneys as compensation is the fact that the issuance of the new stock is not taxable to the class members, but it would be taxable to their counsel. If class counsel are given their fee partly in cash and partly in securities, they would be required to give up much of their cash to the Government to pay the tax on the securities and, in essence, would be left with no cash compensation whatsoever. If the stock were then to lose its value due to bankruptcy, market conditions, or otherwise, class counsel will have received no fee.

As a result of the approved settlement and the infusion of new management into the company, the plaintiff class members are receiving not only an investment in a small health care company under new management, but they also have received in settlement of their claims a return of a portion of their losses in cash. This Court is of the opinion that a fee of approximately ⅓ of the cash portion of the settlement fund is not out of line with typical securities cases as will be discussed *infra* and is only two or three percentage points above the normal range of 20% to 30% of the entire gross fund.

More importantly, the preferred stock does have an immediate liquid value. Because each of the 300,000 shares of the new preferred stock is convertible into five shares of common stock, an immediate val-

ue of the preferred stock is approximately $937,000 (300,000 shares times ⅝ current bid price of common stock per share times 5). Hence, the requested fee is 30.29% of the cash portion of the settlement fund plus the $1.5 million present conversion value of the preferred stock. This 30% fee is within the 20% to 30% rule of thumb even without considering the liquidation preference value of the stock, the "upside" value of the convertible preferred, or the non-monetary benefits conferred on the class.[8]

After reviewing the fees and percentages of funds awarded by various federal courts, it becomes apparent to this Court that the requested fee by class counsel herein, including expenses of 19.5% of the settlement fund created for the class is below the normal range of percentage fees in common fund fee award cases.

■ In their excellent brief, class counsel strongly argue that based upon the Supreme Court's opinions regarding the computation of common fund fee awards,

8. In their memorandum brief, the plaintiffs include a list of securities cases in which fees were awarded out of a common fund. The Court deems it appropriate to include that list of authorities in this memorandum opinion. The following cases are examples of recoveries where fees and the percentage range requested therein are even higher than that requested in the present case: *Shores v. Arkansas Valley Environmental & Utility Authority,* Fed.Sec.L.Rep. (CCH) ¶ 97,936 at 97345 (N.D.Ala.1981), attorneys' fee award of $100,000 on a $325,000 gross recovery before expenses (3077%); *In re Pepsico Securities Litigation,* (S.D.N.Y.), $17,200,000 settlement approved $4,300,000 in fees (25% of the fund); *See,* H. Newberg, *Attorney Fee Awards,* § 1.05 at 6 n. 30; *City of New York v. Darling-Delaware,* 440 F.Supp. 1132 (S.D.N.Y.1977), $1,279,000 fee awarded, $246,311 expenses (29.9% of the fund); *Clark v. Cameron-Brown Co.,* [1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,014 (M.D.N.C.1981) [Available on WESTLAW, 1981 WL 1637] ($996,220 in fees plus $102,994 in expenses (35% of the fund); *Adams v. Standard Knitting Mills, Inc.,* [1987 Transfer Binder] *Fed.Sec.L.Rep.* (CCH) ¶ 96,377 (E.D.Tenn.1978) [Available on WESTLAW, 1978 WL 1074] ($1,160,000 fee (35.8% of the fund)); *Gaines v. Sears, Roebuck & Co.,* [1979–1980 Transfer Binder] *Fed.Sec.L.Rep.* (CCH) ¶ 97,376 (N.D.Ill. 1980) [Available on WESTLAW, 1980 WL 1398] ($1,094,000 in fees (31.06% of class fund)); *In re Warner Communications Securities Litigation,* 618 F.Supp. 735 (S.D.N.Y.1985) *aff'd,* 798 F.2d 35 (2d Cir.1986) ($4,385,000 in fees plus $124,-000 in expenses; (slightly less than 25% of class fund)); *Van Gemert v. Boeing Co.,* 516 F.Supp. 412 (S.D.N.Y.1981) ($3.2 million fee (37.3% of fund)); *Fogel v. Chestnutt,* [1983–84 Transfer Binder] *Fed.Sec.L.Rep.* (CCH) ¶ 99,551 (S.D.N.Y. 1983) [Available on WESTLAW, 1983 WL 1384] ($1.1 million in fees plus approximately $27,000 in expenses (28% of fund)); *Jezarian v. Csapo,* 483 F.Supp. 385 (S.D.N.Y.1979) ($2,095,505 in fees plus $67,075 in expenses not including $450,000 in accountants' fees (19.58% of the fund not including accountants' fees, 23.5% including accountants' fees)); *Charal v. Andes,* 88 F.R.D. 265 (E.D.Pa.1980) ($1,385,000 in fees,

$112.425 in expenses (22% of the fund)); *Bullock v. Administrator of Estate of Kircher,* 84 F.R.D. 1 (D.N.J.1979) ($1,103,449 in fees plus $26,087 in expenses (slightly in excess of the 20% of total settlement fund)); *Valente v. Pepsico, Inc.,* [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,921 (D.Del.1979) [Available on WESTLAW, 1979 WL 1229] ($1,125,000 in fees plus $117,00 in expenses (27% of the fund)); *Miller v. Fisco, Inc.,* [1978 Transfer Binder] *Fed.Sec.L.Rep.* (CCH) ¶ 96,348 (E.D.Pa.1978) [Available on WESTLAW, 1978 WL 1063] ($1,140,000 in fees, (26.5% of the fund); *Harmsen v. Smith,* [1985–86 Transfer Binder] *Fed.Sec.L.Rep.* (CCH) ¶ 92,379 (S.D.Cal.1985) [Available on WESTLAW, 1985 WL 5824] ($3,505,112 in fees (28% of the fund)); *Friedlander v. Barnes,* [1986–1987 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,754 (S.D.N.Y.1986) [Available on WESTLAW, 1986 WL 5517] ($361,894 in fees (30% of the fund)); *Fickinger v. C.I. Planning Corp.,* [1987 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,126 646 F.Supp. 622 (E.D.Pa.1986) ($71,772 in fees plus $44,834 in expenses (33% of the fund)); *Levit v. Filmways, Inc.,* 620 F.Supp. 421 (D.Del.1985) ($160,833 in fees plus $42,500 in expenses (33% of the fund)); *Basile v. Merrill, Lynch, Pierce, Fenner & Smith,* 640 F.Supp. 697 (S.D.Ohio 1986) $3,117,128 in fees (25% of the fund)); *Spencer v. Comserv Corp.,* [1987 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,124 (D.Minn. 1986) [Available on WESTLAW, 1986 WL 5155] ($949,675 in fees plus $167,297 in expenses (approximately 25% of the fund)); *In Re Universal Lubricating Systems, Inc.,* 165 F.2d 664 (3rd Cir.1948) ($100,000 fee (44.5% of the fund)); *In re Magic Marker Securities Litigation,* [1979–1980 Transfer Binder] *Fed.Sec.L.Rep.* (CCH) ¶ 97,116 [Available on WESTLAW, 1979 WL 1248] (E.D.Pa.1979) ($360,000 fee (32.7% of the fund)); *In re Franklin National Bank Securities Litigation,* [1980 Transfer Binder] *Fed.Sec.L.Rep.* (CCH) ¶ 97,571 (E.D.N.Y.1980) (settlement of $2,500,000 (34% of the fee awarded)); *Robertson v. Seidman & Seidman,* [1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,847 (S.D.N.Y.1980) ($40,000 fee (33% of the fund)); *Nelson v. Waring,* [1983–1984 Transfer Binder] *Fed.Sec. L.Rep.* (CCH) ¶ 99,694, 602 F.Supp. 410 (N.D. Miss.1984) ($450,000 fee (33% of the fund)).

the *Johnson* and *Lindy* approaches are no longer applicable in common fund fee cases, but may be used only in determining statutory fee awards. This Court agrees with that analysis. Nevertheless, in an abundance of caution, this Court deems it appropriate to review the requested fee under a lodestar analysis.

## C. CALCULATION OF THE LODE-STAR.

The first step in this analysis is to determine the reasonable rate and reasonable hours an attorney is entitled to and in so doing take into account the various factors which may affect the level of the fee awarded. "The fee applicant bears the burden of establishing entitlement and documenting the appropriate hours and hourly rates.... with sufficient particularity so that the district court can assess the time claimed for each activity." *Norman,* 836 F.2d at 1303. It has been the well-established rule in this circuit that:

> The Court, either trial or appellate, is itself an expert on the question and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment with or without the aid of witnesses as to value.

*Id.*

The applicants filed their application for a fee and reimbursement of expenses jointly and request a single aggregate fee award. Affidavits submitted by each of the class counsel demonstrate that as of February 21, 1988, they have spent an aggregate of approximately 5,300 hours on this case. In addition, they expect to spend at least 1,500 more hours administering the settlement funds.

### 1. *Reasonable Hourly Rate.*

The rates requested must "reflect the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience and reputation." *Norman,* 836 F.2d at 1299, citing *Blum,* 465 U.S. at 895–96 n. 11, 104 S.Ct. at 1547 n. 1547. With a view toward "insuring objectivity, satisfactory evidence must speak to the rates actually billed and paid in similar lawsuits.... which may be adduced by direct evidence of charges paid by lawyers under similar circumstances or by opinion evidence." *Id.* Nonetheless, "the actual rate that the applicants' counsel can command on the market is itself highly relevant proof of the prevailing community rate." *Bebchick,* 805 F.2d 396, 404 (D.C. 1986).

Each of the affidavits filed by the attorneys in support of the joint application for an award of attorneys' fees and reimbursement of expenses includes a description of each attorney's relevant educational background and legal experience; their hourly billing rates; a summary of the number of hours spent by each individual and computerized billing sheets of the daily time log entries showing with specificity hours, and particular activity engaged in on behalf of the plaintiffs logged within twenty-four hours of the activity described. Time and rates for each individual attorney are as follows:

Firm/Attorneys

| Ritchie and Rediker | Hours | Hourly Rate | "Lodestar" Fee | Expenses |
|---|---|---|---|---|
| J. Michael Rediker | 690.90 | $150–200 | $138,180.00 | |
| Carolyn L. Duncan | 122.39 | $150–175 | 21,418.25 | |
| David R. Donaldson | 182.56 | $100–150 | 27,384.00 | |
| David J. Guin | 1.510 | $90–125 | 188,750.00 | |
| Firm's Total | 2544.35 | | $376,502.25 | $70,501.05 |

| Hardin & Taber | Hours | Hourly Rate | "Lodestar" Fee | Expenses |
|---|---|---|---|---|
| Edward L. Hardin | 747.21 | $125–200 | $149,442.00 | |
| James Davis | 32.75 | $100 | 3,275.00 | |
| Firm's Total | 779.96 | | $152,717.00 | $28,220.00 |
| Farmer, Price, Smith | | | | |
| Rufus R. Smith | 1376.34 | $150.00 | $206,451.00 | |
| Edward M. Price | 553.50 | $150.00 | 83,025.00 | |
| Joel W. Weatherford | 29 | $75–115 | 3,335.00 | |
| Freddie Lenton White, III | 35.50 | $75–115 | 4,082.50 | |
| Firm's Total | 1994.34 | | $296,893.50 | $29,442.68 |
| Estimated future services (all three [3] firms) | 1,500 | $148* | $222,000.00 | |
| Total (All Firms) | 3818.65 | | $1,048,112.70 | $128,163.73 |

* This figure represents the average hourly rate for all class counsel.

The Court concludes that the use of top market hourly rates are appropriate in this case in view of the specialized skill and securities law expertise required to litigate a national class action securities case. Each attorney is experienced to handle cases of this complexity. They all have excellent reputations in the legal community and possess the level of competence, perseverance and commitment to litigate such complex cases to successful conclusions, as demonstrated by the results achieved in this case. This Court also bases its opinion on the presentations made by class counsel at numerous hearings conducted by the Court in this case; the pleadings, briefs and documents filed by class counsel; and, legal arguments presented to the Court by class counsel over the course of this litigation. The Court has been extremely impressed with the superb job class counsel did in representing the interests of the plaintiff class members. Furthermore, testimony given at the hearing on approval of the final settlement corroborated the reasonableness of the hourly rates requested in comparison to fee awards in similar lawsuits.[9]

### 2. Hours Reasonably Expended.

■ In determining hours reasonably expended, the trial court should, in its discretion, exclude "excessive, redundant or otherwise unnecessary" hours regardless of the attorneys' skill, reputation or experience. Norman, 836 F.2d at 1301, citing Hensley, 461 U.S. at 434, 103 S.Ct. at 1939.

■ As previously stated in this memorandum opinion, class counsel have spent approximately 5,300 hours in this litigation to date, and expect to spend an additional 1,500 hours administering the settlement fund. Those hours do not include paralegal, secretarial, or legal assistant time, but instead include only time spent by the attorneys prosecuting this case. Class counsel represented that they divided up responsibilities and avoided duplication of effort. This is corroborated by the detailed time records and service summaries class counsel have submitted with affidavits filed in support of their application for attorneys' fees. This Court is of the opinion that the hours spent on this case by class counsel were all reasonably spent, particularly considering the excellent result obtained for the plaintiff class in such a short period of time. There have been virtually no serious objections to the requested fee by class members. Since a careful review of the affidavits itemizing each attorney's time expended shows them to be reason-

9. See the testimony of Edward Kellogg, Jr., Esq., and the testimony of Frank M. Bainbridge, Esq.

able, this Court has no difficulty in awarding a combined lodestar of slightly over $1,000,000.

### 3. *Adjustments of the lodestar.*

After calculating the basic lodestar figure, an adjustment, upward or downward, may be made for results obtained. "If the results obtained were exceptional, then some enhancement of the lodestar may be called for." *Norman,* 836 F.2d at 1302, citing *Pennsylvania v. Delaware Valley Citizens Council,* 478 U.S. 546, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986). The Eleventh Circuit characterizes exceptional results as those that are "out of the ordinary, unusual or rare." *Norman,* 836 F.2d at 1302. Because an attorney's skill is already factored into the reasonable hourly rate, there must be "specific evidence in the record to show that the quality of representation was superior to that which one would reasonably expect in light of the rates claimed," even if the results achieved are exceptional. *Norman,* 836 F.2d at 1302, citing *Blum,* 465 U.S. at 899, 104 S.Ct. at 1549.

Contingency may also affect the level of the lodestar. "In the rare case enhancement may be appropriate, if there is a risk of non-recovery of a fee in the case," *Norman,* 836 F.2d at 1302, citing *Pennsylvania v. Delaware Valley Citizens Council,* —— U.S. ——, 107 S.Ct. 3078, 3089, 97 L.Ed.2d 585 (1987) and then, "only where it is shown that such enhancement is necessary to assure the availability of counsel." *Id.*

Lastly, where there is a delay in the receipt of payment for the prevailing party, a court "should take into account the time value of money and the effects of inflation and generally award compensation at current rates rather than historic rates." *Id.*

The Court finds that it is appropriate, in order to reach a reasonable fee that is fully compensatory, to enhance the lodestar figures for the use of appropriate multipliers. This Court finds a multiplier to reflect contingency; the amount involved/results obtained; and the superior quality of representation in this case. As the district court

in *Edmonds v. U.S.,* 658 F.Supp. 1126 (D.S. C.1987), reasoned, "[a]lthough these factors can be reflected in the lodestar figure, this court has not taken this approach because of the exceptional circumstances found to exist in this case." *Id.* at 1148.

### (a) *Contingency* (Multiplier of 2.0.)

 Contingency is measured by "the probability or likelihood of success viewed at the time of filing suit." *Lindy II,* 540 F.2d at 117; *Edmonds,* 658 F.Supp. at 1148. "The fact that there are successes early in the litigation does not negate the significance that should be accorded to the risk of nonrecovery that counsel assumed at the outset." *Edmonds,* 658 F.Supp. at 1148.

Any fee to be received as compensation by class counsel in this case is entirely contingent upon their receiving a recovery for the plaintiff class. Class counsel have represented to this Court that from the outset they have looked only to this Court's determination of whether and in what amount to award a fee for their compensation.

The evidence presented at the hearing on approval of the final settlement demonstrated to this Court that class counsel have no agreement with anyone for compensation for their time spent in achieving the fund for the class. Instead, they have exercised their efforts and devoted almost their full time to this case with the expectation of receiving their fee solely out of the fund in an amount to be awarded by this Court. Class counsel have borne the entire risk of failing to achieve a successful and substantial result for the class. Although settling the case at a very early stage of the litigation, they already have expended well in excess of $100,000 of out-of-pocket expenses and, by devoting the time and energy this case has required, they have foregone other fees in other cases. As indicated by their time sheets attached to their respective affidavits, some of the class counsel have devoted substantially their full time and attention to this case for what now is over a year.

Each of the plaintiffs' law firms in this case is relatively small. When these firms give up at least one lawyer's time each to a contingent fee case while still having to pay that lawyer some form of salary, the effect on that law firm's financial condition can be severe. Moreover, because an attorney's time is devoted to only one case, the firm often must turn down new cases. Each of the plaintiffs' firms involved in the instant litigation was forced, on several occasions, to turn down potentially winning cases that they otherwise would have accepted had it not been for their time commitment to this case. Indeed, as indicated by one of the affidavits submitted by David Guin, Esq., one of the class counsel, due to their commitment to this litigation, the plaintiffs' firm of Ritchie and Rediker was forced to turn down a class action case that the *Wall Street Journal* has termed the "largest tax shelter fraud in history."

The possibility of not recovering a fee was heightened by the novelty and difficulty of the questions presented in this case which were sharply in dispute. Aside from the very difficult issues presented under the Federal and State Securities Acts, the RICO Act, and the Rule 10b–5 factors of causation, materiality, scienter, and aiding and abetting, difficult issues, and, indeed, issues of first impression, were presented by the professional liability claims and other claims.

For example, a novel issue in the State of Alabama, sharply disputed by Arthur Young & Company and the Wood firm, is the duty owed by professionals such as attorneys and accountants to third parties with whom they are not in privity of contract. The Supreme Court of Alabama has never directly addressed this issue in the context of cases against attorneys or accountants, although it has determined the issue in cases against other professionals, such as engineers.

A similar novel issue under Alabama state law is whether corporate officers and directors and those acting with them owe fiduciary duties directly to stockholders and/or investors in the corporation or whether such duties are owed only to the corporation itself.

Perhaps an even more interesting issue of state law in this case is whether, in view of the Eleventh Circuit Court of Appeals' decision in *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 725 n. 6 (11th Cir.1987), any state law claims can properly be brought as a class action. A determination of this issue necessarily involves a study of the intricacies of Alabama's conflict of laws provisions. That determination is rendered all the more difficult due to the lack of authority in this state on such conflict of laws issues.

The civil RICO claims, by their very nature, are complicated and involved. Moreover, the law on RICO is changing, not only as a result of court decisions, but, as a result of continued legislation by Congress in the area.

Novel issues in this case have also been raised in the securities fraud claims. For example, the plaintiffs named several defendants as controlling persons or members of a controlling group. Very little has been written about the "controlling group" concept and this Court may well have been required to make new law on the subject.

One of the most novel legal issues presented in this case is the plaintiffs' use of defendant underwriter class actions. Such defendant underwriter class actions have been used in reported decisions only in the Ninth and Second Circuits, and no decisions have yet authorized the use of such defendant underwriter class actions for Rule 10b–5 actions or for Section 12(2) actions, except with respect to the liability issue alone. Accordingly, that issue is novel not only in the Eleventh Circuit, but throughout the country.

Thus, the plaintiffs could anticipate an arduous battle, one which would not be considered a "desirable" one by most lawyers who practice law in the Middle District of Alabama. Class counsel have taken five depositions in this case and already have spent well in excess of $100,000 in expenses. This Court recognizes that there are few law firms in the Middle District of Alabama that can bear that sort of ex-

pense, particularly when the prospect is for a protracted trial after several years of discovery followed by additional appeals and possibly further litigation. Additionally, the defendants in this case were represented by some of the very finest lawyers and most prestigious law firms in this country. Each of the defense lawyers in this case represented their clients well and litigated the case furiously which, as advocates, they have a duty to do. The superior competency of defense counsel would make the case even less desirable for most attorneys in this district. Thus, enhancement of the lodestar is appropriate to assume the continuing availability of class counsel in such a case.

(b) *Amount Involved/Results Obtained* (Multiplier of 1.0.)

In *Edmonds*, 658 F.Supp. at 1148, the Court noted that these factors would ordinarily be reflected in the lodestar figure but found that exceptional circumstances existed in the case to justify a multiplier adjustment. Similarly, and perhaps most importantly under the circumstances of this case, an upward adjustment to the multiplier is justified because the results were obtained with superior efficiency or economy, i.e., an early settlement or resolution of a case such as this involving normal and/or complex issues. As stated by Newberg:

> ... it is probable that the superior efficiency or economy in achieving the successful results will yield a time/rate product that is too low to represent reasonable compensation for services. Accordingly, an upward adjustment of the lodestar would be appropriate for the results obtained with a superior savings of costs, so that this commendable effort will be recognized and rewarded, and not penalized.

*Id.*

Thus, the amount, and form of the settlement convinces this Court that an upward adjustment is needed in order to accomplish full and fair compensation under the exceptional circumstances of this case.

(c) *Other Factors* (Multiplier of 3.122.)

The Court will consider the delay in receipt of fees of an upward adjustment factor. In the instant case, there has been a one year delay. Here we also have small law firms that have expended over 5,300 hours of time, that have expended over $100,000 in out-of-pocket expenses, that have had to pay overhead personnel bills, and the other expenditures of financing this type of case. Although this Court applies a lodestar reflecting the highest requested at current going rates which may counter inflation or lost interest, it cannot adequately remunerate class counsel for the delay in payment. Therefore, an upward adjustment of a lodestar to reflect this factor, is in order.

In light of these factors, it is the opinion of this Court that a multiplier of 3.122 is justified, resulting in an adjusted lodestar of $3,272,206.60. A multiplier of approximately 3.1 in a national class action securities case is not unusual or unreasonable.[10] This Court views the lodestar analysis as a means of providing quantifiable documentation of services rendered as a yardstick against which the Court can examine the reasonableness of the fee awarded. This Court is also of the opinion that a reimbursement to class counsel of $128,163.73 for expenses is reasonable.

### CONCLUSION

Class counsel are entitled to an attorneys' fee measured as a percentage of the $17,425,000 fund created for the class by their efforts. Their request of a fee amounting to 19.5% of the fund, including expenses, is clearly reasonable given that only two class members of the thousands of notices sent out have objected to the fee and that such a percentage is below the 20% to 30% rule of thumb to be awarded. In order to set forth readily reviewable findings, this Court arrived at a lodestar figure with a multiplier of approximately

---

**10.** However, because this is a common fund case, ultimately the preferred approach is to determine a reasonable percentage of the fund.

3.1. Under the lodestar analysis, this Court finds that the requested fee is justifiable.

For all of the reasons heretofore stated in this memorandum opinion, it is the opinion of this Court that the fee requested by class counsel is in its entirety, including expenses, due to be approved and awarded.

A separate order will accompany this Memorandum Opinion.

## ORDER

In accordance with the Memorandum Opinion filed contemporaneously herewith, it is the ORDER, JUDGMENT and DECREE of the Court:

1. That the joint application by class counsel for an award of attorneys' fees and reimbursement of expenses filed herein on February 24, 1988, be and the same is hereby GRANTED;

2. That the law firms of Ritchie and Rediker; Hardin and Taber; and Farmer, Price and Smith, be and they are hereby AWARDED, in the aggregate, the sum of $3,400,000.00 in attorneys' fees and expenses to be paid out of the cash portion of the settlement fund created for the plaintiff class through the efforts of said class counsel;

3. That the attorneys' fees and expenses awarded herein be paid to said law firms, in the aggregate, by the Clerk of this Court thirty-one (31) days after entry of this final order and memorandum opinion filed contemporaneously herewith; and

4. That the Clerk of this Court is expressly ORDERED and DIRECTED to enter this order as a final judgment pursuant to Rule 54, *Fed.R.Civ.P.*